**KEHR PACKAGES, INC., Charles and Emily McMurtrie, and James McMurtrie, Appellants,**

v.

**FIDELCOR, INC., Fidelity Bank, Thomas Donnelly, Neil Cohen, James Noon, and Mario Giannini, Esq.**

No. 90–1396.

United States Court of Appeals, Third Circuit.

Argued Nov. 6, 1990.

Decided March 6, 1991.

Rehearing and Rehearing In Banc Denied March 27, 1991.

Joel H. Slomsky (argued), DiGiacomo & Slomsky, Philadelphia, Pa., for appellants.

Walter Weir, Jr. (argued), Patterson & Weir, Philadelphia, Pa., for appellees.

Before SLOVITER, Chief Judge *
SCIRICA and ALITO, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This case requires us once again to address the question of what constitutes a "pattern of racketeering activity" under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. §§ 1961–68 (1984 & Supp.1990). The district court held that plaintiffs did not sufficiently allege such a pattern. We will affirm.

Plaintiffs Kehr Packages, Inc. ("Kehr"), James McMurtrie, Charles McMurtrie, and Emily McMurtrie filed suit against Fidelcor, Inc., Fidelity Bank, N.A. ("Fidelity"), Thomas Donnelly, Neil Cohen, James Noon, and Mario Giannini. The complaint contained both RICO and pendent state law claims arising from an allegedly fraudulent promise to lend money to Kehr. The substantive grounds for the RICO claims were allegations of mail fraud in violation of 18 U.S.C. § 1341. The district court permitted defendants to conduct discovery to determine whether subject matter jurisdiction existed.

Following discovery, defendants filed a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), and a motion for summary judgment. Plaintiffs opposed the motions and filed their own motion for leave to file an amended complaint. The district court granted defendants' motion to dismiss and denied plaintiffs' motion for leave to amend. The court held that plaintiffs had not sufficiently alleged mail fraud, and assuming they had alleged such fraud, the allegations in the complaint did not constitute a "pattern" under RICO. The district court denied plaintiffs' motion for leave to amend on the grounds that the proposed amended complaint would not cure the defects in the original. Plaintiffs now appeal from these rulings.

## I. STANDARD AND SCOPE OF REVIEW

Initially, we must decide what legal standard should govern this appeal. Defendants filed a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). The district court granted this motion because it found the RICO claims in plaintiffs' complaints to be legally insufficient. Thus, although the court denominated its order as one under Rule 12(b)(1), it appeared to dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief could be granted.

 The legal standards governing these two motions are different. A district court can grant a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction based on the legal insufficiency of a claim. But dismissal is proper only when

* The Honorable Dolores K. Sloviter became Chief Judge of the Third Circuit on February 1, 1991.

the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). *See also Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 94 S.Ct. 772, 776, 39 L.Ed.2d 73 (1974) (claim must be "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy"). Ordinarily, a court must assume jurisdiction over a case before deciding legal issues on the merits. *Bell*, 327 U.S. at 682, 66 S.Ct. at 776. A Rule 12(b)(6) dismissal for failure to state a claim is not subject to the same limitations. The claim need not be wholly insubstantial to be dismissed. As this court has noted, "[t]he threshold to withstand a motion to dismiss under [Rule] 12(b)(1) is thus lower than that required to withstand a Rule 12(b)(6) motion." *Lunderstadt v. Colafella*, 885 F.2d 66, 70 (3d Cir.1989).

In this case, we believe the district court's order should properly have been denominated a dismissal under Rule 12(b)(6), and we will treat it as such. *See Black v. Payne*, 591 F.2d 83, 86 n. 1 (9th Cir.) (treating dismissal under Rule 12(b)(1) as one under Rule 12(b)(6)), *cert. denied*, 444 U.S. 867, 100 S.Ct. 139, 62 L.Ed.2d 90 (1979); *see also Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 899 (3d Cir.1987) (considering whether to treat Rule 12(b)(1) dismissal as one under Rule 12(b)(6), but declining to reach issue). Although the court did not discuss the legal standards under which it decided defendants' motion, it considered only the allegations in the complaints and found them "lacking." The court also denied plaintiffs' motion for leave to amend because "it fail[ed] to establish a valid claim under [RICO], and therefore fail[ed] to correct the defects in the original complaint."

A plaintiff may be prejudiced if what is, in essence, a Rule 12(b)(6) challenge to the complaint is treated as a Rule 12(b)(1) motion. When subject matter jurisdiction is challenged under Rule 12(b)(1),

the plaintiff must bear the burden of persuasion. *See Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977). On the other hand, under Rule 12(b)(6) the defendant has the burden of showing no claim has been stated. In *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir.1980), we found that transforming a 12(b)(1) motion into a 12(b)(6) motion would "deprive[ ] the plaintiffs of the procedural safeguards to which they were entitled." *Id.* In this case, however, there is no reason not to treat the motion as having been made under Rule 12(b)(6). In opposing defendants' motion to dismiss, plaintiffs recognized that the motion had been made under Rule 12(b)(1), but stated that "Plaintiffs are treating the Motion of Defendants entitled a 'Motion to Dismiss' as one filed under Rule 12(b)(6)." Memorandum of Law in Support of Plaintiffs Answer in Opposition to Defendants' Motion to Dismiss at 15. In this situation, there is no harm in treating the district court's dismissal as having been made under Rule 12(b)(6). We stress, however, that challenges for failure to state a claim ordinarily should be made under Rule 12(b)(6). *See Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776 (1946).

The district court denied plaintiffs' motion for leave to amend because the proposed amended complaint would also fail to withstand a motion to dismiss. Denials of leave to amend a complaint under Fed.R. Civ.P. 15(a) are reviewed for abuse of discretion. *Kiser v. General Elec. Corp.*, 831 F.2d 423, 426–27 (3d Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 238 (1988). However, reversal is proper when the district court bases its denial on an erroneous rule of law. *Banks v. Wolk*, 918 F.2d 418, 419 (3d Cir.1990); *Centifanti v. Nix*, 865 F.2d 1422, 1431 (3d Cir.1989).

Since plaintiffs sought to amend their complaint to rectify certain defects, the allegations in the proposed amended complaint are the relevant ones for purposes of this appeal. This fact is not of great significance, since the amended complaint adds little additional information to that contained in the original. One difference is that the amended complaint drops Fidelcor,

Inc. and Mario Giannini as defendants; thus, we do not consider any allegations against them. Since we have treated the district court's order as a Rule 12(b)(6) dismissal, we must accept as true all factual allegations in the amended complaint and all reasonable inferences that can be drawn from them. The amended complaint must be construed in the light most favorable to the plaintiffs, and can be dismissed only if the plaintiffs have alleged no set of facts upon which relief could be granted. *Banks*, 918 F.2d at 419.

## II. FACTUAL ALLEGATIONS

This case stems from the leveraged buyout of Kehr by James McMurtrie and Charles McMurtrie. The allegations of the amended complaint are as follows. *See* Amended Complaint at ¶¶ 15–31. On December 12, 1986, the McMurtries entered into an agreement to purchase Kehr. Fidelity agreed to provide $4,165,000 in financing, secured by the assets and accounts of Kehr, and by real estate owned by Charles McMurtrie and his wife Emily McMurtrie. The terms of the loans ranged from five to seven years. Neil Cohen and James Noon handled this loan package for Fidelity. At that time, Cohen was a commercial loan officer at the bank, and Noon was a vice-president.

The original understanding of the parties was that Fidelity would provide, as part of the total $4,165,000 loan, a credit line of $350,000 to be used as working capital for Kehr. *Id.* at ¶¶ 17–18. The eventual loan agreement included a $600,000 line of credit to be used as working capital, and to finance closing costs and pay off Kehr's prior debts. However, at the settlement on December 12, James McMurtrie discovered that this line of credit would be insufficient to fund the necessary $350,000 in working capital. During the settlement, Cohen and Noon, on behalf of Fidelity, made an oral commitment to lend an additional $185,000 for working capital. Cohen and Noon knew that Kehr would operate at a deficit during 1987, and that the working capital would be critically important. In reliance on this commitment, the McMurtries closed

the deal and began operating Kehr. *Id.* at ¶ 31.

Between December, 1986 and August, 1987, Cohen and Noon informed James McMurtrie by telephone "numerous" times that the $185,000 would be available as promised. *Id.* at ¶ 32. However, Cohen and Noon had no intention of providing the money, and "made such commitments in order to induce Plaintiffs to complete the settlement and to insure that Defendant Fidelity Bank would be the recipient of large monthly interest payments, profits and collateral." *Id.* at ¶ 33. Between December, 1986 and July, 1988, Fidelity mailed Kehr invoices for the loan payments. Apparently, during this period Kehr's financial situation became increasingly precarious.

By August, 1987, Cohen and Noon had left Fidelity. In September, responsibility for the Kehr loan was transferred to Thomas Donnelly, a vice-president of Fidelity. The McMurtries believed Donnelly was a high level management consultant who had lending authority. *Id.* at ¶ 41. In reality, he worked in Fidelity's Asset Recovery Group, where he was responsible for protecting and recovering the bank's assets. James McMurtrie repeatedly demanded that Fidelity furnish the additional loan as promised, and Donnelly said that he would "review the credit file and terms and conditions of the loans to determine whether additional funds would be advanced by [Fidelity]." *Id.* at ¶ 38. The amended complaint does not allege that Donnelly ever represented that the funds would be provided. In addition, Donnelly told James McMurtrie that he would commission an appraisal of Kehr's assets, and asked McMurtrie to draft a "plan of attack" demonstrating how Kehr's financial situation could be improved. According to the amended complaint, this request was "part of the course of conduct of Mr. Donnelly aimed at misleading Plaintiffs into believing that he would attempt to secure additional working capital." *Id.* at ¶ 42. However, Donnelly never intended to do so, and in fact had no lending authority. In December, 1987, Donnelly mailed two loan invoices to Kehr. *Id.* at ¶ 45.

In the summer of 1988, the McMurtries found a buyer for Kehr. Fidelity apparently had the contractual right to approve the sale, and Donnelly met with the prospective buyer on July 20, 1988. At this meeting, Donnelly announced that the Kehr loans were in default, and also disclosed that he worked in the Asset Recovery Group. On the same day, Donnelly mailed Kehr a notice of default and confessed judgment against the collateral. The buyer continued with the transaction, but Donnelly and Fidelity "unreasonably delayed" approving the sale, despite knowing that the buyer faced a specific deadline. *Id.* at ¶ 54. As a result, the buyer withdrew its offer. In September, 1988, Donnelly ordered Kehr to cease operations and liquidate its assets.

## III. STATUTORY LANGUAGE

The RICO statute authorizes civil suits by "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c) (1988). Section 1962 contains four separate subsections, each addressing a different problem. Section 1962(a) prohibits "any person who has received any income derived ... from a pattern of racketeering activity" from using that money to acquire, establish or operate any enterprise that affects interstate commerce. Section 1962(b) prohibits any person from acquiring or maintaining an interest in, or controlling any such enterprise "through a pattern of racketeering activity." Section 1962(c) prohibits any person employed by or associated with an enterprise affecting interstate commerce from "conduct[ing] or participat[ing] ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." Finally, section 1962(d) prohibits any person from "conspir[ing] to violate any of the provisions of subsections (a), (b), or (c)."

■ In this case, the amended complaint alleges violations of §§ 1962(a), (b), (c) and (d). Case law has established separate requirements for certain subsections. Under § 1962(a), a plaintiff must allege injury specifically from the use or investment of income in the named enterprise. *Rose v. Bartle*, 871 F.2d 331, 357–58 (3d Cir.1989). *But see Busby v. Crown Supply, Inc.*, 896 F.2d 833, 836–40 (4th Cir. 1990) (rejecting "investment use" rule). Fidelity and its parent companies are the named enterprises in this case. Amended Complaint at ¶ 61. The injury stems from the allegedly fraudulent activities of Noon, Cohen, and Donnelly, but is not specifically linked to the use or investment of income in any named enterprise. Thus, § 1962(a) cannot be a basis for liability in this case. Similarly, under § 1962(b), a plaintiff must allege a specific nexus between control of a named enterprise and the alleged racketeering activity. *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1168 n. 2 (3d Cir.1989). Since the amended complaint does not allege such a nexus, the § 1962(b) count also must be dismissed.

■ The § 1962(c) claim is not subject to these nexus limitations, and therefore is a possible basis for liability here. However, while an entity can be both an enterprise and a defendant for purposes of § 1962(a), such a dual role is impermissible in actions based on § 1962(c). *See Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir.1990). Fidelity is named as both a defendant and an enterprise. Since § 1962(c) is the only available basis for liability, Fidelity must be dismissed as a RICO defendant. Because Fidelity cannot be a RICO defendant, it cannot be held liable under a respondeat superior theory for the RICO violations of its employees. *See Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1359 (3d Cir.1987). We will consider separately the allegations against each individual defendant under § 1962(c).[1]

## IV. THE "PATTERN" REQUIREMENT

■ A "pattern of racketeering activity" requires commission of at least two predi-

---

**1.** Because we hold that plaintiffs did not state a valid claim under § 1962(c), *see infra* at 1417–19, we need not consider whether the dependent § 1962(d) claim has been properly alleged. *Cf.* *Rose v. Bartle*, 871 F.2d 331, 365–67 (3d Cir. 1989) (discussing pleading requirements for § 1962(d) claim).

cate offenses on a specified list. 18 U.S.C.A. §§ 1961(1), (5) (1984 & Supp.1990). The predicate acts alleged in this case are instances of mail fraud in violation of 18 U.S.C. § 1341. But a pattern requires more than commission of the requisite number of predicate acts. In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court stressed that a plaintiff must show also "that the racketeering acts are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900 (emphasis in original).

In *H.J. Inc.*, customers of a telephone company alleged that the company had been bribing state regulatory officials to gain approval for excessive telephone rates. This alleged bribery occurred over a six-year period and consisted of cash and in-kind payments, and negotiations for future employment with the company. *Id.* at 232–33, 109 S.Ct. at 2897. The Court held that these allegations stated a valid claim under RICO.

The Court emphasized that allegations cannot constitute a RICO "pattern" unless they satisfy both the "relatedness" and "continuity" tests. Both tests depend heavily on the specific facts of each case. The Court adopted a broad multi-factor test for relatedness, which focuses on whether the alleged predicate acts " 'are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* at 240, 109 S.Ct. at 2901 (quoting Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575(e) (1982), *repealed by* Sentencing Reform Act of 1984, Pub.L. No. 98–473, tit. II, § 212(a)(2), 98 Stat.1987). The Court found that the allegations in *H.J. Inc.* satisfied this test, because the alleged acts of bribery were related by the common purpose of influencing state regulators. *Id.* 109 S.Ct. at 2906.

In discussing the continuity requirement, the Court rejected the theory that a RICO pattern requires proof that a defendant engaged in multiple criminal "schemes." *Id.* at 240, 109 S.Ct. at 2901. The Court noted that the concept of a "scheme" ap-

pears nowhere in the statute or its legislative history, and is difficult to define. Rather, related predicate acts in furtherance of a single scheme can constitute a pattern if the acts constitute or present the threat of long-term continuous criminal activity. Proof of multiple schemes is "highly relevant" to the question of continuity, but is not a prerequisite for a finding of a RICO pattern. *Id.*

■ Of course, not every single scheme comprising two or more predicate acts will constitute a pattern. Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902. A short-term scheme threatening no future criminal activity will not suffice. Although Congress intended a "natural and commonsense approach to RICO's pattern element" and continuity "depends on the specific facts of each case," *id.* at 237, 242, 109 S.Ct. at 2899, 2902, the Court delineated some parameters of the analysis. The Court stressed that continuity is "centrally a temporal concept." *Id.* at 242, 109 S.Ct. at 2902. Thus, the length of time over which the criminal activity occurs or threatens to occur is an important factor. As the Court noted, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.* One method of demonstrating continuity is to show that "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* This showing can be made with respect to otherwise legitimate entities, or when "the predicate acts can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.*

This court has also noted other factors that are relevant to the "pattern" inquiry. In *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir.1987), we focused on "the number of unlawful acts, the length of time over which the acts were committed, the similar-

ity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." This approach is entirely consistent with *H.J. Inc. See Marshall–Silver Constr. Co. v. Mendel*, 894 F.2d 593, 596 (3d Cir.1990). After *H.J. Inc.*, however, "we must focus on these factors as they bear upon the separate questions of continuity and relatedness." *Banks*, 918 F.2d at 423.

In *H.J. Inc.*, the Court found the requisite continuity. The Court first noted that "the racketeering predicates occurred with some frequency over at least a 6–year period, which may be sufficient to satisfy the continuity requirement." 492 U.S. at 250, 109 S.Ct. at 2906. Alternatively, the allegations sufficiently indicated that "the alleged bribes were a regular way of conducting [the defendant's] ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise." *Id.*

Following *H.J. Inc.*, this court affirmed dismissals in two cases for failure to allege a sufficient RICO pattern. In *Marshall–Silver Construction Co. v. Mendel*, 894 F.2d 593 (3d Cir.1990), the complaint contained allegations of extortion and mail fraud in connection with the filing of a false bankruptcy petition. We noted that the predicate acts were concluded in less than seven months, and that "the alleged illegal activity posed no threat of *additional* repeated criminal conduct over a significant period." *Id.* at 597 (emphasis in original). In *Banks v. Wolk*, 918 F.2d 418 (3d Cir.1990), the plaintiffs alleged, among other things, that the defendants had used an inside partner to drive down the price of certain real estate. We found no RICO pattern with respect to those defendants involved only in that scheme, noting that the injury to the plaintiff occurred during an eight month period, and that the scheme "was an attempt to defraud a single investor of his interest in a single piece of real estate over a relatively short period of time." *Id.* at 422. As in *Marshall–Silver*, we found no indication of additional conduct that would constitute a threat of long-term criminal activity.

In *Swistock v. Jones*, 884 F.2d 755 (3d Cir.1989), we found the continuity requirement satisfied with respect to an alleged real estate fraud that lasted approximately one year. As we stressed in *Marshall–Silver* and *Banks*, however, the complaint in *Swistock* contained allegations of further misrepresentations by the defendants in regard to other potential transactions with the plaintiffs. *Id.* at 759. *See Marshall–Silver*, 894 F.2d at 597; *Banks*, 918 F.2d at 423. Thus, although a single fraudulent scheme can give rise to RICO liability, when that scheme is short-lived and directed at a limited number of people, this court has required some further indication that the defendant's fraudulent activities are likely to continue.

## V. THE MAIL FRAUD ALLEGATIONS AND THEIR EFFECT ON THE PATTERN ANALYSIS

The district court found that the complaints failed to state valid claims of mail fraud. In some RICO cases, it will be clear that a defendant's actions do not constitute a pattern without an examination of the legal sufficiency of the predicate acts. But since the pattern inquiry must assess whether the defendant's actions "amount to or pose a threat of continued criminal activity," *H.J. Inc.*, 109 S.Ct. at 2900, it is often helpful to examine the actions which are alleged to form the basis of criminal activity.

In cases involving allegations of mail fraud, this inquiry is complicated by the nature of the statute. The mail fraud statute prohibits any person from knowingly causing the use of the mails "for the purpose of executing" any "scheme or artifice to defraud." 18 U.S.C.A. § 1341 (Supp.1990). The actual violation is the mailing, although the mailing must relate to the underlying fraudulent scheme. Moreover, each mailing that is "incident to an essential part of the scheme" constitutes a new violation. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The mailing need not contain any misrepresentations. Rather, " 'innocent' mailings—ones that contain no

false information—may supply the mailing element." *Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989).

■ The mailing element is not very helpful in examining the sufficiency of a RICO pattern allegation. The relatedness test will nearly always be satisfied in cases alleging at least two acts of mail fraud stemming from the same fraudulent transaction—by definition the acts are related to the same "scheme or artifice to defraud." But the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice. Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis.

For example, the "number of unlawful acts" is a factor in determining continuity. *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir.1987). But the continuity question should not be affected by the fact that a particular fraudulent scheme involved numerous otherwise "innocent" mailings, rather than only a few. As the Court of Appeals for the Seventh Circuit recently has reaffirmed:

> Mail fraud and wire fraud are perhaps unique among the various sorts of "racketeering activity" possible under RICO in that the existence of a multiplicity of predicate acts (here, the mailings) may be no indication of the requisite continuity of the underlying fraudulent activity.

*Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir.1990) (quoting *Lipin Enters., Inc. v. Lee*, 803 F.2d 322, 325 (7th Cir.1986) (Cudahy, J., concurring)). *Accord United States Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1268 (7th Cir.1990); *Sutherland v. O'Malley*, 882 F.2d 1196, 1205 n. 8 (7th Cir.1989); *International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir.1987) (decided before *H.J. Inc.*). *See also Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278 (7th Cir.1989) ("the number of [mail or wire fraud] offenses is only tangentially related to the underlying fraud, and can be a matter of happenstance.").

In this case, the loan invoices sent to Kehr constitute the main basis for the mail fraud allegations. But the quantity of otherwise innocent invoices cannot by itself transform defendants' alleged fraud into a RICO pattern. It should not be relevant, for example, that Fidelity sent invoices on a monthly basis, rather than quarterly or yearly. However, if a defendant committed numerous acts of deceit as part of multiple schemes or a single ongoing fraud, this fact would be relevant to the continuity question, although not necessarily dispositive. Moreover, it would be relevant if particular mailings, unlike those in this case, contained false or misleading statements or otherwise constituted separate deceptive acts.

The importance of focusing in the continuity analysis on deceptive activity rather than otherwise innocent mailings is demonstrated by the holding in *H.J. Inc.* that continuity can be shown when "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." 492 U.S. 229, 109 S.Ct. at 2902. In that case, separate bribes to different government officials sufficiently indicated that bribery was a regular way of doing business for the defendant. *Id.* 109 S.Ct. at 2906. In this case, if we were to focus only upon the mailings, we would necessarily conclude that sending invoices was a regular way of conducting Fidelity's business. Such a holding would extend RICO's scope to all allegations of mail fraud based upon two or more otherwise routine business mailings, a result we believe Congress did not intend. Rather, we must examine whether defendants' underlying deceptive activities constitute a regular way of doing business. This question was not faced in *H.J. Inc.*, since each bribe in that case independently constituted a criminal act, without reference to any underlying illegal scheme.

At this time, we need not decide precisely which types or combinations of fraudulent actions will present the requisite continuity. But we note that the mailings in this case present a different situation from that recently faced by the Court of Appeals for

the First Circuit in *Fleet Credit Corp. v. Sion*, 893 F.2d 441 (1st Cir.1990). In that case, the defendants obtained three separate business loans over a five year period and allegedly misappropriated the collateral for their personal use. The plaintiff's RICO claim was predicated on acts of mail fraud consisting of 95 checks allegedly used by the defendants to dissipate the collateral over a four and one-half year period. The court found that these actions constituted "long-term criminal conduct" under *H.J. Inc. Id.* at 446–47. The court noted that "[h]ad the number of acts alleged by [the plaintiff] been few or the period of time short, the predicate acts would not have amounted to continued criminal activity." *Id.* at 447.

The court noted, however, that each separate mailing constituted a new breach of the defendants' promise not to remove, transfer, or destroy the collateral. *Id.* at 443. Thus, the defendants' deceptive activities were ongoing during the entire four and one-half year period, and each mailing constituted a new fraudulent act. Moreover, during this period, the defendants applied for and received two new loans. In this case, by contrast, the mailings did not constitute separate fraudulent actions, but related entirely to the initial allegedly deceptive actions of the defendants. We do not believe that the *Fleet* court focused on the number and duration of the mailings without considering their integral connection to the ongoing long-term deceptive activities.[2]

■ We now examine the allegations of deceptive activity in this case. Under the mail fraud statute, a scheme or artifice to defraud "need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension."

*United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir.1978). The scheme need not involve affirmative misrepresentation, *see United States v. Frankel*, 721 F.2d 917 (3d Cir.1983), but the statutory term "defraud" usually signifies " 'the deprivation of something of value by trick, deceit, chicane or overreaching.' " *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 2880, 97 L.Ed.2d 292 (1987) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). *Accord Carpenter v. United States*, 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987).

■ The amended complaint alleges that Cohen and Noon misrepresented on numerous occasions that the additional funds would be provided. Since these appear to be actionable misrepresentations, we will assume without deciding that the amended complaint sufficiently alleges that Cohen and Noon have engaged in a "scheme or artifice to defraud" in violation of the mail fraud statute. We also will assume without deciding that the invoices sent to Kehr satisfy the "mailing" element. Thus, we will assume that Cohen and Noon have committed predicate acts of mail fraud. We note, however, that the district court held that defendants' actions could not constitute mail fraud because plaintiffs "offer[ed] no evidence to suggest the statements the bank mailed out were inaccurate, or fraudulent in any way." This analysis was incorrect. As the Supreme Court recently held in *Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989), completely "innocent" mailings can satisfy the mailing element.

■ The allegations against Donnelly are of a different sort. The amended complaint asserts that Donnelly engaged in three separate deceptive actions after Co-

**2.** In dicta, the court noted that "[a] threat of criminal activity ... is not established merely by demonstrating that common law fraud was a regular way of conducting [the defendants'] ongoing business. Rather, [the plaintiff] must demonstrate that the *predicate acts*—here the acts of mail fraud—were a regular way of conducting the ongoing business." *Id.* at 448 (emphasis in original). It does not appear that the court was emphasizing the mailings over the underlying fraud. Instead, the court likely was referring to the fact that a plaintiff must sufficiently allege a connection between a particular fraudulent scheme and some mailing. *See id.* at 444–45 (apparently finding that plaintiffs did not sufficiently plead connection between certain allegations of common law fraud and use of mails).

hen and Noon had left Fidelity. First, Donnelly's request for a "plan of attack" was part of a scheme to "mislead[ ] Plaintiffs into believing that he would attempt to secure additional working capital." Amended Complaint at ¶ 42. Although Donnelly said that he would attempt to secure additional working capital, unlike Cohen and Noon he never represented that the capital would be provided. Second, Donnelly did not disclose that he worked in the Asset Recovery Group, and that he had no lending authority. Third, he "unreasonably delayed" approving the proposed sale of Kehr.

Even construing the complaint in the light most favorable to appellants, none of these allegations could form the basis for a separate mail fraud violation on the part of Donnelly. We recognize that the mail fraud statute has been "expansively construed." *United States v. Boffa*, 688 F.2d 919, 925 (3d Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983). But none of Donnelly's alleged acts or omissions could be "reasonably calculated to deceive a person of ordinary prudence and comprehension." *Pearlstein*, 576 F.2d at 535. Thus, the individual allegations against Donnelly do not constitute additional criminal activity that would help establish "continuity" under RICO.

The "plan of attack" request falls squarely within the ambit of normal business communications, especially considering the financial state of Kehr, and contains no deceptive elements. *Cf. Blount Financial Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 153 (6th Cir.1987) (plaintiff's reliance on defendant's quotation of interest rate was unreasonable in business setting, and precluded mail fraud claim); *McEvoy Travel Bureau, Inc. v.*

*Heritage Travel, Inc.*, 904 F.2d 786 (1st Cir.) (allegations of kickbacks, rebates and illegal rent payments could not be construed as scheme to deceive and thus could not be basis for mail fraud violation), *cert. denied*, ── U.S. ──, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990). Likewise, the non-disclosure of Donnelly's job title cannot constitute mail fraud absent further allegations. Since Donnelly never represented that he had lending authority, or that the funds would be provided, his non-disclosure cannot reasonably be said to be deceptive. *See, e.g., United States v. Von Barta*, 635 F.2d 999, 1006–07 (2d Cir.1980) (non-disclosure not actionable under mail fraud statute absent some duty to disclose), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *see also Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249 (7th Cir.1989) (absent elaborate efforts at concealment, or larger pattern of misrepresentations or half-truths, mere non-disclosure cannot constitute mail fraud).[3]

Moreover, even if these actions were somehow deceptive, they were calculated only to mislead plaintiffs into believing that Donnelly would "attempt" to secure additional funds. Since Donnelly never indicated that the funds would be provided, there was no deceit nor fraud within the meaning of the mail fraud statute. By contrast, the deceptions of Cohen and Noon are alleged to have caused plaintiffs to close the deal and incur injury when the funds were not provided. We note that 18 U.S.C. § 1346, which amended the mail fraud statute to include schemes that "deprive another of the intangible right of honest services," does not apply to this case, since all of the defendants' alleged actions occurred prior to the effective date of the statute. *See* 18 U.S.C.A. § 1346

---

**3.** Mail fraud can also be predicated on mailings made after the completion of the scheme, but which are " 'designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.' " *United States v. Lebovitz*, 669 F.2d 894, 896 (3d Cir.), *cert. denied*, 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982) (*quoting United States v. Maze*, 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38

L.Ed.2d 603 (1974)). In this case, however, we find as a matter of law that Donnelly's alleged actions could not have served this purpose. A person of ordinary prudence and comprehension could not be misled by Donnelly's indications that he would look into whether Fidelity would provide additional funding. *Cf. Pyramid Securities, Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1118 (D.C.Cir.1991) (rejecting similar "lulling" claim in civil RICO action).

(Supp.1990) (effective Nov. 18, 1988) (overruling *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)).[4]

Finally, the allegation that Donnelly "unreasonably delayed" approving the sale of Kehr, while possibly amounting to a breach of contract, contains no deception that would bring it within the purview of the mail fraud statute. *Cf. United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir.1980) ("the [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract. Its condemnation of a 'scheme or artifice to defraud' implicates only plans calculated to deceive."); *see also* Amended Complaint at ¶ 83 (unreasonable delay not alleged as misrepresentation in common law fraud count).

We emphasize that the responsibility for determining the factual sufficiency of fraud allegations remains with the factfinder. In this case, though, the allegations against Donnelly simply contain no indication of the deception or overreaching which the mail fraud statute requires. We also recognize that appellants possibly could have demonstrated at trial that Donnelly was engaged in a common mail fraud scheme with Noon and Cohen. *See, e.g., United States v. Camiel*, 689 F.2d 31, 36 (3d Cir.1982) (mail fraud violation can be proved by showing common scheme rather than conspiratorial agreement). In this event, Donnelly would have been held liable for the misrepresentations of Cohen and Noon. But for purposes of RICO continuity, the separate allegations against Donnelly do not add to the criminal activity alleged against Cohen and Noon.

## VI. THE "PATTERN" ALLEGATION IN THIS CASE

Plaintiffs in this case have not sufficiently alleged that defendants engaged in a "pattern of racketeering activity." Since the complaint alleges numerous acts of mail fraud related to the common purpose of causing Kehr to default on its loans, the relatedness requirement is satisfied. But the amended complaint does not set forth acts that "amount to or pose the threat of continuing criminal activity." Rather, as in *Marshall–Silver* and *Banks*, the allegations here involve a short-term attempt to force a single entity into bankruptcy, and contain no additional threat of continued criminal activity. Nor does this case involve a "long-term association that exists for criminal purposes." *See H.J. Inc.*, 492 U.S. at 243, 109 S.Ct. at 2902.

We have established that the critical acts for purposes of the continuity analysis are the misrepresentations of Cohen and Noon. The same misrepresentations regarding the additional loan were repeated "numerous" times over an eight month period. *H.J. Inc.* holds that the actual or threatened duration of a scheme is an important factor in determining whether a defendant's actions amount to long-term criminal activity. When mail fraud is alleged, the question of duration becomes more difficult. As we noted in *Marshall–Silver*, "[v]irtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are 'related' by purpose and are spread over a period of at least several months." 894 F.2d at 597. In this case, the length of the scheme as originally conceived was indeterminate, since it would depend on how long Kehr could survive without the promised $185,000 in additional working capital. The mailing of loan invoices could possibly have continued for seven years, the term of the longest loan.

However, we do not place much emphasis on the fact that the mailings might have continued for years. As we have noted, a defendant's deceptive actions are more im-

---

**4.** We follow the other Courts of Appeals that have held that § 1346 has no retroactive effect. *See United States v. Telink, Inc.*, 910 F.2d 598, 601 n. 2 (9th Cir.1990); *United States v. Granberry*, 908 F.2d 278, 281 n. 1 (8th Cir.1990); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.) (civil RICO case), *cert. denied*, — U.S. —, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990); *United States v. Bush*, 888 F.2d 1145, 1145–46 (7th Cir.1989); *United States v. Stewart*, 872 F.2d 957, 960 n. 2 (10th Cir.1989); *Corcoran v. American Plan Corp.*, 886 F.2d 16, 19 n. 4 (2d Cir.1989); *United States v. Davis*, 873 F.2d 900, 902 (6th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 292, 107 L.Ed.2d 271 (1989).

portant to the continuity analysis than otherwise innocent mailings. Thus, the relevant criminal conduct occurred during the initial eight month period, when the misrepresentations were made. We noted in *Marshall–Silver* that the duration of a scheme should not be afforded overriding significance "in the absence of a more significant societal threat." *Id.* Since we found the scheme in that case to be sufficiently short-term, we did not rely on this statement and need not embrace it at this time. *But see United States Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1268–69 (7th Cir.1990) (adopting *Marshall–Silver* language). We do hold, however, that in determining the duration of a scheme involving mail fraud, the relevant criminal conduct is the defendant's deceptive or fraudulent activity, rather than otherwise innocent mailings that may continue for a long period of time. *Cf. United States Textiles,* 911 F.2d at 1268 (noting that each mail and wire fraud count "relates back" to initial extortions, and that duration of transaction at issue was "pure happenstance in light of the underlying concern which is the 'continuity' of the criminal activity").

We must apply a "natural and common-sense approach to RICO's pattern element." *H.J. Inc.*, 492 U.S. at 237, 109 S.Ct. at 2899. Consequently, it should not be important that otherwise innocent mailings might continue long after the deceptive practices cease. If the term of the Kehr loans had been several decades rather than several years, it would not make the initial actions of Cohen and Noon any more deserving of RICO sanctions. *Cf. Dana Corp. v. Blue Cross & Blue Shield*, 900 F.2d 882, 887 (6th Cir.1990) (repeated fraudulent misrepresentations during seventeen year life of contract sufficient to state pattern). As in *Marshall–Silver* and *Banks*, an eight-month period of fraudulent activity directed at a single entity does not constitute a pattern, absent a threat of future criminal acts.

This case, therefore, is unlike *H.J. Inc.*, which involved six years of bribes directed at five members of a regulatory agency. The alleged bribes were numerous and varied, consisting of cash payments, job negotiations, and payments for meals and entertainment. *See* 492 U.S. at 233, 109 S.Ct. at 2897. Each separate bribe contributed to an ongoing scheme aimed at influencing future ratemaking decisions. This evidence led the Court to find sufficient indication that bribery was a regular way of doing business for the defendant.

Besides the significant disparity in longevity between the schemes in *H.J. Inc.* and the present case, there are other salient differences. First, there is no apparent threat that the misrepresentations of Cohen and Noon would have continued past the time they left Fidelity. By contrast, the regulatory decisions involved in *H.J. Inc.* were a continuous part of the defendant's business, and thus the bribes likely would have continued into the future. Unlike *Swistock*, the additional confirmatory misrepresentations of Cohen and Noon did not concern future transactions, and thus do not pose a threat of additional criminal activity. There is no indication that Cohen or Noon made other false statements to Kehr, or treated other customers in a similar manner. Consequently, the allegations in the amended complaint do not indicate that fraud was "a regular way of doing business" for any defendant. *Cf. H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. Nor, as we have noted, does this case involve a "long-term association that exists for criminal purposes." *See id.*

Second, the bribes in *H.J. Inc.* were individually directed at five different officials. As we noted in *Swistock*, the Supreme Court did not rely on the fact that the actual victims of the bribes—the telephone company's customers—were numerous. *See* 884 F.2d at 758. However, it certainly should be relevant that the criminal activity was separately directed at several different people. *Cf. Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir.1987) ("the scheme involved the repetition of similar misrepresentations to more than twenty investors"). In this case, the direct target of the criminal activity was a single entity. Kehr's individual shareholders and guarantors, and the holders of

pledged collateral, were affected only indirectly.

Third, each bribe in *H.J. Inc.* separately contributed to the injury inflicted on the plaintiffs. *Cf. Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986) ("occurrence of distinct injuries" is factor in pattern analysis). In this case, the damage to plaintiffs was largely accomplished at the moment of settlement. Although the number of misrepresentations can be an important factor, the confirmatory misrepresentations made after settlement do not transform the actions of Cohen and Noon into a "pattern of racketeering activity." There is no allegation that Kehr was caused to forgo additional financing because of the false confirmations; on the contrary, a buyer was found for Kehr after Cohen and Noon left Fidelity. Thus, the repeated misrepresentations did not contribute any injury additional to that already inflicted. Nor is it relevant that each loan payment constituted additional economic detriment to Kehr. Absent continuous long-term fraudulent activity, it is of little importance that a particular injury was inflicted over an extended period of time, rather than all at once. *See United States Textiles, Inc. v. Anheuser–Busch Cos.,* 911 F.2d 1261, 1269 (7th Cir.1990) ("[I]dentical economic injuries ... stemming from a single contract were not the type of injuries which Congress intended to compensate via the civil provisions of RICO.").

## VII. CONCLUSION

Plaintiffs may have valid claims of common law fraud or breach of contract, but based on the allegations of the complaint and the proposed amended complaint, which we have assumed throughout are true, they cannot maintain a RICO suit. Thus, we will affirm the dismissal of the RICO and pendent state law claims against all defendants, and the denial of plaintiffs' motion for leave to amend their complaint.

ALITO, Circuit Judge, concurring in part and dissenting in part.

I concur in the decision of the court insofar as it affirms the dismissal of the plaintiffs' claims under 18 U.S.C. § 1962(a) and (b), but I would reverse the dismissal of plaintiffs' claims under 18 U.S.C. § 1962(c) and (d). As the majority notes, denial of plaintiffs' motion for leave to amend and the dismissal of their claims may be sustained only if the amended complaint proffered by the plaintiffs failed to state a claim upon which relief could be granted. Maj. op. at 1408–10. The majority affirms the dismissal of the claims under 18 U.S.C. § 1962(c) and (d) on the ground that the amended complaint did not sufficiently allege a "pattern" of racketeering activity. I respectfully disagree with the majority's analysis of the pattern requirement and with its application in the present case.

### I.

The amended complaint alleged that the bank and several officers carried out a scheme to defraud the McMurtries, who obtained more than four million dollars of secured loans to finance their leveraged buyout of Kehr Packages, Inc. The bank and its officers allegedly induced the McMurtries to enter into loan agreements that provided insufficient working capital for successful operation of the company. This was accomplished, the complaint asserts, by fraudulent oral promises that additional financing would be provided. According to the complaint, the purpose of this scheme was to obtain large interest payments and, ultimately, the pledged collateral, which exceeded the value of the loans. The complaint alleged that the defendants, in carrying out this scheme, committed numerous acts of mail fraud, 18 U.S.C. § 1341, during a period of one year and seven months, from December 1986 to July 1988.

The specific factual allegations in the complaint are set out in the majority opinion (maj. op. at 1410–11), but the following salient allegations merit emphasis. At the settlement of the loans on December 12, 1986, two bank officers, Neil Cohen, a commercial loan officer, and James Noon, a vice president, orally promised that an additional $185,000 in working capital would be provided. App. 241a–42a. For the next

eight months, Cohen and Noon repeated this promise during "numerous" telephone conversations with James McMurtrie. *Id.* at 242a. Cohen and Noon, however, never intended to fulfill their promises but made them to obtain interest payments and the pledged collateral for their employer. *Id.* at 243a.

In September 1987, after Cohen and Noon had left the bank, Thomas Donnelly, another vice president, took over responsibility for the loan and began a "course of conduct ... aimed at misleading plaintiffs into believing that he would attempt to secure additional working capital" when his real purpose was to prepare for foreclosure on the assets of the company and the personal assets of the McMurtries. *Id.* at 243a–46a. To carry out this plan, Donnelly "act[ed] for months on the pretense of being a management consultant" (*id.* at 248a) although he actually worked in the bank's Asset Recovery Group. *Id.* at 245a–46a, 248a. Donnelly promised to look into the question of increased working capital, when in fact he had no intention of doing so. *Id.* at 244a–46a. He also requested that plaintiffs draft a "plan of attack" for profitably operating the company, although he was actually preparing for foreclosure. *Id.* at 245a–46a. Finally, Donnelly undermined an agreement for sale of the company during the summer of 1988 by unreasonably delaying approval of the transaction, and in September 1989 he ordered Kehr to cease operations and liquidate. *Id.* at 248a–49a. I stress that these are merely the unproven factual allegations in the complaint, but at the present stage we are bound to accept them as true. In my view, these allegations sufficiently allege a "pattern of racketeering activity."

## II.

The RICO statute, 18 U.S.C. § 1961(1) defines "racketeering activity" to mean any of a long list of predicate offenses, including mail fraud (18 U.S.C. § 1341). The statute states that a " 'pattern of racketeering activity' *requires* at least two acts of racketeering activity" (18 U.S.C. § 1961(5)) (emphasis added). The com-

plaint in this case alleges more than two such acts.

In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court held that a "pattern of racketeering activity" must satisfy two additional requirements not mentioned in the statute itself: "relatedness" and "continuity." I agree with the majority that the complaint in the present case satisfied the requirement of "relatedness," and therefore the sole remaining hurdle is the requirement of "continuity."

In *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902, the Supreme Court explained that " '[c]ontinuity' is both a closed- and open-ended concept." For present purposes, I think it is helpful to discuss these two concepts in reverse order.

The open-ended concept of continuity refers to a series of predicate acts that is cut short, either by law enforcement efforts or other intervening events, but that threatened long-term criminal conduct. *Id.* In *H.J. Inc.*, the Court gave several examples of how such threatened criminal conduct may be shown. In some cases, the Court noted (*id.* 242), it may be proven that the perpetrators expressly threatened repeated acts of racketeering. In other cases, the Court observed (*id.*), it may be shown that the predicate offenses were part of an ongoing entity's regular way of doing business, thus giving rise to the inference that such offenses would have continued if not interrupted.

In addition to these examples provided by the Supreme Court, several factors previously identified by this court are useful in determining whether a threat of future racketeering acts has been alleged or shown. Factors such as the number of unlawful acts, the number of perpetrators, the number of victims, and the character of unlawful activity (*Barticheck v. Fidelity Union Bank/First National State*, 832 F.2d 36, 39 (3d Cir.1987)) may be indicative of threatened criminal conduct in particular cases. Based upon all of these factors and examples, I fully agree with the majority that the complaint in the present case does

not allege facts showing a threat of racketeering activity extending beyond the end of the completed scheme alleged. I therefore turn to the concept of "closed-ended" continuity.

Although the discussion of this concept in *H.J. Inc.* is brief, the Court's opinion makes clear, in my view, that the predominant, if not sole, consideration in determining whether a closed-ended pattern has been alleged or proven is the duration of the racketeering activity. The Court stated flatly (492 U.S. at 242, 109 S.Ct. at 2902) that "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." Likewise, the Court observed (*id.*) that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." These statements do not seem to leave room for anything other than a measurement of the duration of the racketeering activity. To be sure, the Court noted (*id.*) (emphasis added) that continuity is *"centrally* a temporal concept," thus perhaps implying that the concept has another peripheral component. The Court, however, provided no clue regarding the nature of any such additional component.

Whether or not closed-ended continuity contains any such additional component, it seems clear that several factors have no place in determining whether closed-ended continuity has been alleged or shown. First, the absence of any threat of future racketeering activity is irrelevant in determining whether closed-ended continuity is present. The threat of future criminal activity is the essence of open-ended continuity but has no bearing on closed-ended continuity, which refers by definition to repeated conduct that has fully run its course.

Second, many of the factors listed by this court in *Barticheck* and related cases, with the obvious exception of "the length of time" of the criminal conduct (*Barticheck*, 832 F.2d at 39), have no logical connection to closed-ended continuity. *Cf. Banks v. Wolk*, 918 F.2d 418, 423 (3d Cir.1990) ("Af-

ter *H.J. Inc.*, we must focus on these factors as they bear upon the separate questions of continuity and relatedness.") Factors such as the number of unlawful acts, the number of perpetrators, the number of victims, the similarity of the acts, and the societal harm associated with the unlawful activity have nothing to do with the duration of the racketeering activity. In addition, these factors, with the exception of the number of unlawful acts, are not logically related to the ordinary meaning of the term "continuous," which refers to an "uninterrupted extension" in space, time, or sequence. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 493–94 (1971).

Since closed-ended continuity, as described in *H.J. Inc.*, is primarily a question of duration, it is critical to zero in on the line between "a substantial period of time," which may satisfy *H.J. Inc.*, and "a few weeks or months," which do not. 492 U.S. at 242, 109 S.Ct. at 2902. In cases decided after *H.J. Inc.*, this court has upheld the dismissal of complaints alleging racketeering activity over closed-ended periods of less than seven months (*Marshall–Silver Construction Co., Inc. v. Mendel*, 894 F.2d 593 (3d Cir.1990)) and eight months (*Banks v. Wolk, supra*). Since these periods are substantially shorter than that alleged in the present case, these precedents do not control our decision here.

By contrast, in *Swistock v. Jones*, 884 F.2d 755, 759 (3d Cir.1989) (emphasis added), the court held that a complaint alleging predicate acts of wire and mail fraud "over a period of approximately fourteen months" was sufficient to show *"either* the existence of a closed-ended period of repeated conduct of sufficient length *or* a threat of continuity...." Although the majority attempts to distinguish *Swistock* based on the presence in that case of open-ended continuity (maj. op. at 1413), I believe the holding in *Swistock* rested on two independent grounds. I read *Swistock* to hold that, even without allegations suggesting the threat of future criminal conduct, the alleged acts of wire and mail fraud extending over 14 months satisfied the pattern requirement by showing closed-

ended continuity. Because the complaint in the present case alleges numerous acts of mail fraud extending over an even longer period (19 months), *Swistock* weighs in favor of reversal here.

The relevant legislative history points to the same result. In concluding that the "pattern" element necessitates proof of "continuity," the Supreme Court relied[1] primarily upon the following passage from the Senate Report on RICO (S.Rep. No. 91–617, at 158 (1969) (emphasis added):

> The target of [RICO] is ... not sporadic activity. *The infiltration of legitimate business normally requires* more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern.

This seminal passage appears to measure "continuity" by reference to the period of time normally required for the infiltration of legitimate business. As the Supreme Court has recognized, preventing the infiltration of legitimate business by organized crime was the major objective expressed during congressional consideration of the RICO statute.[2]

In light of this legislative history, closed-ended continuity should not require racketeering activity extending over a longer period of time than Congress felt would normally be required for the infiltration of a legitimate business by means of the various RICO predicates, such as murder, kidnapping, arson, bribery, or fraud. 18 U.S.C. §§ 1961(1) and 1962(b). It would be anomalous to construe the concept of closed-ended continuity so narrowly that efficient campaigns to infiltrate legitimate businesses—the heart of congressional concern when RICO was originally enacted—

are excluded from the coverage of that concept. And there is no reason to suppose that Congress felt such campaigns ordinarily take longer than 19 months (the period at issue here) or 14 months (the period in *Swistock*). Accordingly, in my view, the 19 month period alleged in this case constituted, in the terminology of *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902, a "substantial" period of time, rather than "a few weeks or months," and thus satisfied closed-ended continuity.

### III.

Although the complaint in this case alleges acts of mail fraud extending over a period of 19 months, the majority whittles this period down to eight months. The majority achieves this result in two stages. First, the majority concludes that in RICO cases grounded on mail fraud predicates the duration of the racketeering activity should be measured, not by the duration of the mail fraud violations, which may be based on "innocent" mailings, but by the duration of the "instances of deceit." Maj. op. at 1413–15. Second, the majority concludes that the only relevant "instances of deceit" in this case are the alleged misrepresentations of Cohen and Noon, because the allegations against Donnelly, when viewed in isolation, do not establish criminal conduct. Maj. op. at 1415–17. I disagree with both parts of this analysis.

The first part of this analysis is inconsistent with the plain language of the RICO statute. The statute, 18 U.S.C. § 1961(1), equates "racketeering activity" with the listed predicate offenses.[3] Therefore, the duration of racketeering activity for the purpose of judging closed-ended continuity

---

1. *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900. *See also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

2. In *United States v. Turkette*, 452 U.S. 576, 591, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981) (footnote omitted), the Court wrote:
 > [T]he legislative history forcefully supports the view that the major purpose of [RICO] is to address the infiltration of legitimate busi-

ness by organized crime. The point is made time and again during the debates and in the hearings before the House and Senate.

3. The statute provides in pertinent part (18 U.S.C. § 1961(1)) that "racketeering activity" means any of a long list of predicates, including "(B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud)."

must equal the duration of the related predicates.

Moreover, even if it were proper in a case with mail fraud predicates to look beyond the duration of the mail fraud violations and measure the duration of the deceitful conduct, the focus of inquiry should be on the fraudulent scheme, not the repetition of fraudulent statements. If a fraudulent scheme is launched convincingly, there may be no need for a repetition of the fraudulent statements made at the outset. But as long as the scheme continues—as long as the original false statements are left uncorrected and victims continue to be deceived—the deceitful conduct must be regarded as continuing. Under the majority's analysis, the deceitful conduct in such a case would apparently be regarded as finished once the original false statements were made—although the deceitful conduct would apparently be regarded as continuing if the original false statements were not entirely convincing and therefore had to be repeated over and over. This approach does not seem to make sense.[4]

The second part of the majority's analysis is also flawed. The majority labors to show that if the allegations against Cohen and Noon are disregarded, the remaining factual allegations against Donnelly would not establish that he committed mail fraud; the majority then reasons that the allegations against Donnelly should not be considered in calculating the duration of the deceitful activity. Maj. op. at 1415–17.

In my view, there is no justification for examining the specific allegations against Donnelly in isolation. Fairly read, the complaint alleges that Cohen and Noon launched the fraudulent scheme with outright misrepresentations and that Donnelly later joined the scheme and perpetuated it by means of statements and conduct that were misleading in light of what Cohen and Noon had said and done before. Consequently, I think it is entirely artificial to judge Donnelly's alleged behavior without

considering its claimed role in the entire scheme.

In the present case, the complaint alleged that the fraudulent scheme and the mailings in furtherance of the scheme continued for 19 months. That period, I believe, is ample to show closed-ended continuity.

---

**4.** The term "innocent mailings" confuses analysis of the question before us. This is a term of art that was used in *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), and related cases to refer to mailings that contain no false information but form part of the execution of the criminal scheme. *See* 489 U.S. at 715, 109 S.Ct. at 1449. Since such mailings help to execute the criminal scheme, they are not really innocent.