BLUE LINE COAL COMPANY, INC.,
Anthony J. Bukovich, Jr. and
Roberta J. Bukovich

v.

EQUIBANK, William M. Densmore
and John A. Kincaid, Jr.

Civ. A. No. 87–6150.

United States District Court,
E.D. Pennsylvania.

July 3, 1991.

Robert E. Slota, Conrad J. Miller, III, Murphy & Slota, Bryn Mawr, Pa., for plaintiffs.

Joan R. Sheak, Klehr, Harrison, Harvey, Branzburg and Eller, Allentown, Pa., for defendants.

Richard J. Klein, Pittsburgh, Pa., for Equibank.

## MEMORANDUM

LUDWIG, District Judge.

Defendants Equibank, William M. Densmore and John A. Kincaid, Jr. move for summary judgment.[1] Fed.R.Civ.P. 56(c).

### I.

The amended complaint sets forth violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, together with pendent state law counts for breach of contract, interference with prospective contractual relations, fraud, and breach of fiduciary duty. Jurisdiction is RICO and federal question. 18 U.S.C. § 1964(c); 28 U.S.C. § 1331.

---

1. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The movant must show that there is no triable issue. The nonmovant having the burden of proof at trial must point to affirmative evidence in the record—and not simply rely on allegations or denials in the pleadings—in order to defeat a properly supported motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Williams v. Borough of West Chester,* 891 F.2d 458, 460, 463–64 (3d Cir.1989).

As set forth in memorandum dated June 9, 1989,[2] the trial issues were bifurcated. *See Blue Line Coal Co. v. Equibank*, 1989 WL 63203, 17 (E.D.Pa. June 12, 1989).[3] By decision dated April 2, 1991, it was determined that "[t]he declaration of default contained in the letter of March 7, 1984 sent by defendant Densmore on behalf of defendant Equibank to plaintiff Anthony Bukovich, Jr. was legally unjustified under the workout agreement and the loan documents and the facts of this case." *Blue Line Coal Co. v. Equibank*, No. 87–6150, slip op. at 18 (E.D.Pa. April 2, 1991).

By order dated April 2, 1991, the parties were directed to submit memoranda on the issue whether defendants' alleged conduct constituted a pattern of racketeering activity sufficient to state a RICO claim in light of *Kehr Packages, Inc. v. Fidelcor Inc.*, 926 F.2d 1406 (3d Cir.1991), *cert. denied*, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).

## II.

### A.

The following facts are part of a pretrial stipulation:

At all relevant times, Blue Line Coal Co., Inc. ("Blue Line"), among other things, was a coal broker and Anthony Bukovich was President and majority shareholder of Blue Line. At all relevant times, Blue Line had contracts to supply coal to two utilities in Michigan: Upper Peninsula Power Co. ("UPPCO") and City of Marquette Board of Power and Light ("Marquette").

In September of 1980, Blue Line obtained a $2,000,000 line of credit from Equibank. Anthony and Roberta Bukovich borrowed $107,000 from Equibank on September 8, 1980. On July 10, 1981, Blue Line signed a demand note in the amount of $500,000. On July 17, 1981,

Blue Line signed a demand note in the amount of $500,000.

After negotiations between Blue Line, the Bukoviches and their lawyer and Equibank and Equibank's lawyer, the parties entered into a "Workout Agreement" on October 1, 1983. The Workout Agreement provided for Equibank's receipt of coal contract proceeds. Under a formula recited in the Agreement, Equibank was to apply part of the funds to the Blue Line debt and forward the balance to Blue Line.

Pretrial stip. at 1–2.

### B.

The following fact findings were made in the bench decision dated April 2, 1991:[4]

1. The workout agreement summarized plaintiffs' loan history with Equibank and referred to existing loan documents, including notes, a line of credit agreement, guarantees and suretyships. It described Blue Line's coal contracts with UPPCO and Marquette and acknowledged that these contracts were assigned to Equibank as security for plaintiffs' indebtedness. The agreement also referred to Blue Line's coal supply contract with Hiller Fuels, Inc. *See* exh. P1/D16 at ¶¶ 1–3.

2. In paragraph 2 of the workout agreement, Equibank agreed not to use remedies available under the line agreement, line note and other documents so long as plaintiffs complied with the workout agreement. *See* exh. P1/D16 at ¶ 2; exh. D1 (promissory note); D2 (personal loan); D3 (line agreement); D4 (security agreement); D5 (guarantee and suretyship); D6 (demand loan); D7 (demand loan).

3. By letter dated March 7, 1984, mailed within a day or two thereafter, Equibank wrote to plaintiff Anthony Bukovich and declared that the workout agreement was no longer in effect, as follows:

---

**2.** This memorandum was filed on June 12, 1989.

**3.** "If the resolution is in plaintiffs' favor, they may proceed on RICO claims under § 1962(c) and (d). If, on the other hand, it is determined that plaintiffs were in breach of the workout agreement, as represented by defendants, the RICO counts will be dismissed and jurisdiction

relinquished of the remaining state law claims." *Blue Line*, 1989 WL 63203 at 17.

**4.** The exhibits and transcripts referred to in this subsection and subsection C are from the nonjury trial held August 28–30, 1990.

Dear Mr. Bukovich:

This is to advise you that the terms and conditions of the Workout Agreement dated October 1, 1983 between Equibank, Blue Line Coal Company and Anthony and Roberta Bukovich are no longer in effect due to and including failure to produce the required tonnage in 1983. There have, and continue to be certain disputes between the Bank, Blue Line Coal Company, Hiller Fuels and Upper Lakes Coal Company that seriously effect the contracts. Further, the amount of coal to be shipped under the contract in 1984 and 1985 will be insufficient to retire the debt as originally contemplated in the agreement.

We will disburse funds received to Hiller Fuels for coal supplied. The balance will be held in cash collateral for payment of the Equibank loan, or such other disbursements that Equibank deems appropriate.

Blueline [sic] Coal Company has guaranteed certain obligations of Coil Investments. Demand for payment was served on Blue Line but the matter has not been resolved. Blue Line has not provided financial information or an accounting as requested in our January meeting. Affidavits have been served on the bank by Hiller Fuels as to the provisions imposed on Blue Line.

Sincerely,

/s/ W.M. Densmore, Vice President

Exh. D32.

4. William M. Densmore, an officer in Equibank's loan adjustment department, became responsible for the Blue Line and Bukovich loans beginning in 1982 when they first went into default. Tr. C at 6, 18. He continued to manage these accounts through 1984. Tr. C at 18.

5. The original Blue Line/Bukovich indebtedness was $3,107,000. It is unclear how much was owed at the time the workout agreement was declared in default.

*Blue Line,* slip op. at 2–8.

### C.

The following legal conclusions were made in the bench decision dated April 2, 1991:

Equibank's reasons do not constitute grounds for declaring Blue Line to be in default under the workout agreement or loan documents or by implication of law.

1. Blue Line was required to pay to Equibank the IRS refund upon receipt— which had not occurred.

2. The workout agreement incorporated the coal contracts, which provided for the possibility of shortfalls. The workout agreement did not require Blue Line to ship a minimum amount of coal.

3. Under the coal contracts, Blue Line had the opportunity to cure any quality deficiency before it could become a basis for default. *See* exh. D8A, D8B and D9 at article VII.

4. The workout agreement does not require Blue Line to continue to use either Hiller Fuels or Upper Lakes.

5. Blue Line did not act in bad faith in performing its obligations under the workout agreement from October 1, 1983 to March 7, 1984.

Inasmuch as none of the reasons stated in the Densmore letter of March 7, 1984 constitutes legal grounds for Equibank to have terminated the workout agreement, plaintiffs have established that Equibank violated the workout agreement by declaring it to be in default.

*Blue Line,* slip op. at 16–17.

### III.

Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

Defendants contend that "[e]ven if plaintiffs had proffered evidence that defendants committed racketeering activity

through acts of mail or wire fraud, defendants are still entitled to summary judgment because there is no evidence of a 'pattern' of such activity." Def. summary judgment mem. at 17.

■ A "pattern of racketeering activity" requires commission of at least two predicate offenses. 18 U.S.C. § 1961(5).[5] *See Kehr*, 926 F.2d at 1411–12. Here, as in *Kehr*, the predicate acts alleged are instances of mail and wire fraud in violation of 18 U.S.C. § 1341.

"[A] pattern requires more than commission of the requisite number of predicate acts." *Kehr*, 926 F.2d at 1412. A plaintiff must show also "that the racketeering acts are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (emphasis in original).

Central to the concept of a RICO pattern is that the predicate acts satisfy both the "relatedness" and "continuity" tests. *See Kehr*, 926 F.2d at 1412; *Banks v. Wolk*, 918 F.2d 418, 422 (3d Cir.1990). To satisfy the relatedness test, the alleged predicate acts must be "interrelated by distinguishing characteristics and ... not isolated events." *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901.

■ The continuity requirement may be satisfied with proof that the defendant engaged in multiple criminal schemes. However, "related predicate acts in furtherance of a single scheme can constitute a pattern if the acts constitute or present the threat of long-term continuous criminal activity. Proof of multiple schemes is 'highly relevant' to the question of continuity, but it is not a prerequisite for a finding of a RICO pattern." *Kehr*, 926 F.2d at 1412 (citing *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901).

Of course, not every single scheme comprising two or more predicate acts

will constitute a pattern. Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." [*H.J.*,] at 241, 109 S.Ct. at 2902. A short-term scheme threatening no future criminal activity will not suffice.

*Kehr*, 926 F.2d at 1412. *See Banks*, 918 F.2d at 421 (single fraudulent scheme with no threat of repetition insufficient for a RICO pattern); *Marshall–Silver Construction Company v. Mendel*, 894 F.2d 593, 597–98 (3d Cir.1990) (seven month scheme without threat of additional criminal conduct insufficient for a RICO pattern). When a single fraudulent scheme is "short-lived and directed at a limited number of people, ... some further indication that the defendant's fraudulent activities are likely to continue" is required. *Kehr*, 926 F.2d at 1413. *See, e.g., Swistock v. Jones*, 884 F.2d 755 (3d Cir.1989) (defendants' alleged wrongdoing tainted other potential transactions with plaintiffs). Continuity can be shown when the predicate acts or offenses are part of an ongoing entity's regular way of doing business. *See H.J. Inc.*, 492 U.S. at 229, 109 S.Ct. at 2902.

"[S]ince the pattern inquiry must assess whether the defendant's actions 'amount to or pose a threat of continued criminal activity,' *H.J. Inc.*, 109 S.Ct. at 2900, it is often helpful to examine the actions which are alleged to form the basis of criminal activity." *Kehr*, 926 F.2d at 1413.

In RICO cases based on predicate acts of mail fraud,

[t]he relatedness test will nearly always be satisfied in cases alleging at least two acts of mail fraud stemming from the same fraudulent transaction— by definition the acts are related to the same "scheme or artifice to defraud." But the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice. Although the mailing is the actual criminal act, the instances of deceit constituting

---

5. " '[P]attern of racketeering activity' requires at least two acts of racketeering, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

the underlying fraudulent scheme are more relevant to the continuity analysis. *Kehr*, 926 F.2d at 1414.[6]

## IV.

Here, the essence of the alleged RICO scheme is that Equibank, through its vice-president William Densmore, created a fraudulent pretext to declare the workout agreement null and void in order to take control of the coal contracts. *See* amended complaint ¶ 48; pltf. summary judgment mem. at 7–8. The fraudulent pretext was that Blue Line Coal Company had defaulted on its workout agreement with the bank when in fact it had not done so.

Perhaps this alleged scheme was begun as early as October, 1983 when the parties entered into the workout agreement. Plaintiffs refer to handwritten notes of an officer of Upper Lakes Coal Company summarizing discussions with William Densmore concerning the workout agreement. One note dated October 17, 1983 describes the terms of the workout agreement. *See* pltf. summary judgment exh. A. Another dated February 23, 1984 reports that "the bank is going to attempt to revoke the Work–Out Agreement with Tony." *See* pltf. summary judgment exh. A. A third note dated March 26, 1984 states "that Equibank had considered the Agreement with Blue Line not to be in effect, due to problems and disputes with Blue Line, and

that Equibank had terminated the Agreement." *See* pltf. summary judgment exh. A.

 These recordations confirm that the bank and the coal company had communicated in regard to the bank's decision to declare the workout agreement in default. They do not by themselves permit a reasonable inference of any fraudulent intent or conspiratorial motive on the bank's part. Banks are in the business of making loans, entering into security and workout agreements, and pursuing collection by enforcing loan collateral. It is well known that their officers make mistakes and approve bad loans or obtain less than adequate security or commit other errors of business judgment. They may also misapply the law or act on poor or mistaken legal advice. None of these kinds of misjudgment or actions taken in the usual course of a bank's business can be equated with fraud or, in turn, racketeering activity. There is no evidence that the bank officer's conduct in this case went beyond the ordinary practices of a bank executive who is responsible for the administration and enforcement of a workout agreement.

 Assuming, however, that William Densmore *fraudulently misrepresented the workout agreement to be in default*, the RICO requirement of a "pattern of racketeering activity" remains unsatisfied.[7] The

6. *See also Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir.1990) ("Mail fraud and wire fraud are perhaps unique among the various sorts of 'racketeering activity' possible under RICO in that the existence of a multiplicity of predicate acts (here, the mailings) may be no indication of the requisite continuity of the underlying fraudulent activity").

7. Following the bench decision dated April 2, 1991, plaintiffs filed "exceptions, and motion to amend, the decision under Federal Rule of Civil Procedure 52(a)." That motion will be denied.

Plaintiffs' position is that if plaintiffs "had been aware of the potential submission of special interrogatories to the fact-finder concerning the alleged 'beliefs' of Mr. Densmore, they would not have agreed to trial of the breach of contract agreement by the court without a jury, but, rather, would have insisted upon submission of those special interrogatories to a jury." Pltf. motion ¶ 8. The bench trial resolved the

issue whether plaintiffs were in breach of the workout agreement. Fed.R.Civ.P. 52 requires "the court [to] find the facts specifically and state separately its conclusions of law." *See Scalea v. Scalea's Airport Service, Inc.*, 833 F.2d 500, 502 (3d Cir.1987).

Here, Equibank claimed that plaintiffs' failure to preserve the coal contracts discharged the bank from any of its duties under the workout agreement. *See Blue Line*, slip op. at 16–17 n. 5. "Findings of fact must include as much of the subsidiary steps by which the trial court reached its ultimate conclusion on each factual issue." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2579 at 710. Inasmuch as Equibank relied upon the existence of some discharging factor, the factual findings relating to Mr. Densmore's belief were proper. *See* 5A Corbin, Contracts § 1228 at 507–08 ("[I]f the defendant relies upon the existence of some discharging factor, the burden of proceeding to establish it is on him—he must allege and offer respectable evidence of its existence").

relatedness element is made out by numerous instances of alleged wire and mail fraud having the common purpose of declaring the agreement no longer in effect. *See* amended complaint ¶¶ 27–28, 32, 37, 48, 58. *See also Kehr,* 926 F.2d at 1417. But, as in *Kehr,* what is lacking are acts that "amount to or pose the threat of continuing criminal activity." *Kehr,* 926 F.2d at 1417. "Nor does this case involve a 'long-term association that exists for criminal purposes.' *See H.J. Inc.,* 492 U.S. at 243, 109 S.Ct. at 2902." *Kehr,* 926 F.2d at 1417. *Kehr* and similar decisions stand for the proposition that civil RICO was intended to be a remedy for criminal misconduct. The continuity required to establish a "pattern of racketeering activity" is a limitation or parameter that helps to effectuate Congressional intent.

■ As to the purported continuity in this case, the allegedly fraudulent acts occurred, at most, within a matter of months. That related but otherwise innocent mailings continued long after the deceptive practices ceased does not show continuity. *See Kehr,* 926 F.2d at 1417–19 ("[A] defendant's deceptive actions are more important to the continuity analysis than otherwise innocent mailings"). Here, plaintiffs cannot rely on the bank's continued control of the coal contracts. Once the bank declared default and took over the coal contracts, the fraudulent scheme, if it existed, was concluded.[8] *Compare Kehr,* 926 F.2d at 1419.[9] *Contrast Fleet Credit Corp. v.*

*Sion,* 893 F.2d 441, 443 (1st Cir.1990) (each separate mailing in a scheme to dissipate the collateral securing three separate business loans constituted a new breach of defendants' promise not to remove, transfer or destroy the collateral).

In addition, the fraud is not alleged to have been defendants' "regular way of doing business." *Kehr,* 926 F.2d at 1418. *Compare H.J. Inc.,* 492 U.S. at 233, 109 S.Ct. at 2897 (bribes individually directed at five different officials); *Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987) ("the scheme involved the repetition of similar misrepresentations to more than twenty investors").

Plaintiffs have established that defendants violated the workout agreement under Pennsylvania law. However, having failed to adduce or identify facts showing the requisite pattern of racketeering activity, they cannot maintain a RICO action.[10]

## V.

■ Under the doctrine of pendent jurisdiction,[11] a federal court may entertain state law counts arising out of a "common nucleus of operative fact" on which a federal cause of action is based, even though jurisdiction would not otherwise be present. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). "Judicial 'power' to hear a pendent claim requires the existence of a 'substantial' federal claim sufficient to confer subject matter jurisdiction on the court.

Moreover, defendants' motion for summary judgment has been considered separately and apart from the findings contained in the bench trial decision. *See* def. summary judgment mem. at 12–17 (arguing "no facts support plaintiffs' claims of mail or wire fraud"). Even if defendants were not entitled to summary judgment on the fraud issue, plaintiffs' own theory of the case, as expressed in their pleadings and the summary judgment record, is factually insufficient to substantiate a RICO pattern because of lack of continuity.

8. On March 26 and 28, 1984 Equibank sent UPPCO and Marquette letters informing them that Equibank was taking control of the coal contracts. *See* def. summary judgment exh. 4 at 8–9. On April 3, 1984 UPPCO and Marquette acknowledged Equibank's action. *See* def. summary judgment exh. 4 at 11–12.

9. "[T]he damage to plaintiffs was largely accomplished at the moment of settlement. Although the number of misrepresentations can be an important factor, the confirmatory misrepresentations made after settlement do not transform the actions … into a 'pattern of racketeering activity.' " *Kehr,* 926 F.2d at 1419.

10. Defendants' arguments relating to (1) lack of injuries by reason of racketeering activity and (2) existence of an association-in-fact separate and apart from Equibank are not reached.

11. The Judicial Improvements Act of 1990, Pub.L. 101–650, codified pendent jurisdiction under the name "supplemental jurisdiction." 28 U.S.C. § 1367.

*Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138." *Nerman v. Alexander Grant & Co.*, 683 F.Supp. 1293, 1294 (W.D.Mo.1988).

Defendants contend that if summary judgment is granted in their favor on the RICO claim, this court is without jurisdiction to consider any of the state law claims. *See* def. summary judgement mem. at 22–23.

■ Generally, if all the federal claims involved in a lawsuit are dismissed, a court should refrain from exercising pendent jurisdiction in the absence of "extraordinary circumstances." *See Lovell Mfg. v. Export–Import Bank of the U.S.*, 843 F.2d 725, 735 (3d Cir.1988). Unless these circumstances are present, "a district court ... is powerless to hear claims lacking an independent jurisdictional basis." *Lovell*, 843 F.2d at 735.

In determining whether such circumstances are present, "the district court should focus on prejudice to the plaintiffs resulting from possible delays in adjudicating their state law claims, rather than the investment of time already devoted to the federal court lawsuit." *Shaffer v. Board of School Directors of the Albert Gallatin Area School District*, 730 F.2d 910, 912 (3d Cir.1984) (Shaffer II). *See also Shaffer v. Board of School Directors of the Albert Gallatin School District*, 687 F.2d 718, 722–23 (3d Cir.1982) (Shaffer I). The district court must "articulate specific 'considerations of judicial economy, convenience and fairness to [the] litigants' that would support pendent jurisdiction." *Shaffer II*, 730 F.2d at 913. "[T]ime already invested in litigating the state cause of action is an insufficient reason to sustain the exercise of pendent jurisdiction." *Weaver v. Marine Bank*, 683 F.2d 744, 746 (3d Cir.1982).

Here, the amended complaint states substantial federal claims.[12] *See Blue Line*, 1989 WL 63203 at 5–16. On September 30, 1987 plaintiffs filed their first complaint. The parties agreed that the threshold question apart from RICO was whether or not plaintiffs were in breach of the workout agreement. *See Blue Line*, 1989 WL 63203 at 16. As a result, the issues were bifurcated,[13] and after a bench trial, the breach of contract claim was decided in favor of plaintiffs on the merits. *See Blue Line*, slip op. at 18.

■ The breach of contract claim has already been litigated in the context of the RICO litigation. That claim presents no new issues of state law. *See Shaffer II*, 730 F.2d at 913 ("[W]here the underlying issue of state law is a question of first impression ... factors weighing in favor of state court adjudication certainly predominate"). All that remains to be considered is damages. Although plaintiffs filed a protective action in the Philadelphia Court of Common Pleas,[14] considerations of fairness to plaintiffs and judicial economy favor retaining pendent jurisdiction over the breach of contract claim. *See Disher v. Information Resources*, 873 F.2d 136, 140 (7th Cir.1989) ("[T]here is a considerable social interest in writing finis to litigation"); *Graf v. Elgin, Joliet and Eastern Railway Company*, 790 F.2d 1341, 1347–48 (7th Cir.1986) ("Judicial economy, the essential policy behind the modern doctrine of pendent jurisdiction which *Gibbs* created, supports the retention of pendent jurisdiction in any case where substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort"); *Nerman*, 683 F.Supp. at 1295 ("These reasons for exercising pendent jurisdiction

12. "The substantiality of the federal claim is ordinarily determined on the basis of the pleadings." *Cito v. Bridgewater Township Police Dept.*, 892 F.2d 23, 26 (3d Cir.1989).

13. In the process of scheduling the bench trial, it was stated:

[Assuming the Court would grant] summary judgment on the RICO claims, deciding that there was not enough for example to show a pattern of racketeering activity. Since at that

point the default would have already been established, the default on the part of the bank, I would not relinquish jurisdiction over the pendent claims because ... it would be unreasonable and unfair at that stage of the proceedings to do so.

Audio tape of December 5, 1989 hearing.

14. *See Blue Line Coal Co. v. Equibank*, No. 200, March Term, 1988 (C.P. Philadelphia).

over the state claims significantly outweigh the availability of a state forum for resolution of the claims").

On the other hand, state law defenses are raised to count III ("intentional interference with performance of contracts by third persons"), count IV ("intentional interference with prospective contractual relations"), and count V ("fraud and breach of fiduciary duty"). As to these counts, pendent jurisdiction will be relinquished.

### ORDER

AND NOW, this 3rd day of July, 1991:

1. Defendants' motion for summary judgment on count I, under RICO, is granted.

2. Count II, the contract claim, will proceed on the issue of damages.

3. Pendent jurisdiction is relinquished on counts III, IV and V.

4. Plaintiffs' motion to correct or modify the decision dated April 2, 1991 is denied.