**UNITED STATES of America**

v.

**Michael ZOMBER.**

**Crim. No. 03–46–02.**

United States District Court,
E.D. Pennsylvania.

Feb. 28, 2005.

Gilbert J. Scutti, Dickstein and Scutti, Philadelphia, PA, for Defendant.

Robert E. Goldman, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

RUFE, District Judge.

On January 23, 2003, a grand jury indicted Defendants Michael Zomber and Richard Ellis on one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Ellis pleaded guilty on February 24, 2003. Zomber went to trial. On December 15, 2003, after more than three days of trial, a petit jury convicted Zomber on the count charged in the indictment. Zomber has now filed a Motion to Vacate His Conviction and for Entry of Judgment of Acquittal or a New Trial. For the reasons set forth below, Zomber's Motion is denied.

## I. FACTUAL BACKGROUND

Beginning in approximately 1995, Joseph Murphy became a serious collector of antique firearms. Initially, Murphy focused his collection on European, Flintlock and Wheel-lock pistols. 12/10/03 N.T. at 51. As he collected these guns, Murphy befriended Tom Wibberley, who was a firearms expert and who became Murphy's agent for acquiring additional guns.[1] *Id.* at 50–51. As Murphy's agent, Wibberley received a commission based on the cost of the guns he helped Murphy obtain. In 1996, Wibberley apprised Murphy of the availability of a set of Colt firearms called the General Anderson set (the "Anderson Set"), named for the Civil War hero. *Id.* at 52. Murphy ultimately purchased the Anderson Set from Defendant Ellis, Zomber's co-conspirator, for 3.5 million dollars. *Id.* at 53. This was Murphy's first pur-

---

1. Mr. Wibberley passed away before the trial.

chase of Colt firearms and his first interaction with Ellis, whom Wibberley had introduced to Murphy as an expert in Colt firearms. *Id.*

Following the sale of the Anderson Set, Ellis initiated a scheme to sell Murphy additional antique Colt pistols for inflated prices. 12/12/03 N.T. at 104. Ellis also wanted to replace Wibberley as Murphy's sole representative in the area of antique firearms and used Wibberley's relationship with Murphy to do so. *Id.* at 104. Zomber was aware of and participated in this scheme. *Id.* Ellis accomplished both of his goals, and under Ellis' tutelage, Murphy spent approximately thirty million dollars acquiring his collection of antique Colt firearms. 12/10/03 N.T. at 90. The conspiracy charged in the indictment and the evidence presented at trial related primarily to the sales of four of these guns, referred to in the pleadings and trial transcript as: 1) the Walker 1009; 2) the Walker 1010; 3) the Union & Liberty; and 4) the 1862 Police.

### The Walker 1009

Murphy first learned about the Walker 1009 from Wibberley, who was still his agent at the time. As Wibberley explained to Murphy, the Walker 1009, along with the Walker 1010, had belonged to Samuel H. Walker, a famous Texas Ranger who fought in the Mexican War. 12/10/03 N.T. at 56. Wibberley told Murphy that Ellis owned the Walker 1009 and wanted to arrange a meeting between Ellis and Murphy. Murphy, however, was concerned about the cost of the gun, which Wibberley had informed him would be over one million dollars. *Id.* Specifically, Murphy was cautious about spending so much on the Walker 1009 because it had been a regularly used gun and was not in pristine condition. *Id.* at 57.

After Murphy expressed his concern to Wibberley, he received a faxed letter from Zomber, dated May 16, 1997, on letterhead of the Michael Zomber Company, stating that Zomber had a client who was willing to pay one million dollars for the Walker 1009. *Id.* at 58–60; Exh. G–11. The letter specified the terms of the offer and stated that the offer would remain open until June 15, 1997. At that time, Murphy had never met Zomber but knew from Wibberley that Zomber was a gun dealer from southern California and that he was an antique firearms expert. *Id.* at 60. Murphy testified that this letter was "the selling feature that made me buy the Walker 1009." *Id.* at 62.

What Murphy did not know is that Zomber had drafted the May 16, 1997 letter at the request of Ellis and that the story about a client willing to pay one million dollars for the Walker 1009 was completely fabricated by Zomber. 12/12/03 N.T. at 108. In fact, Ellis, with Zomber's assistance, had purchased the Walker 1009 in January 1997, for $600,000. 12/11/03 N.T. at 121–37. When Murphy expressed concern about the cost of the gun, Zomber concocted the story in the May 16, 1997 letter. Murphy received the letter on May 31, 1997 and purchased the Walker 1009 for $1,050,00 on June 3, 1997. 12/10/03 N.T. at 66–71; Exhs. G–12, G–13. Ellis later appraised the gun for Murphy at a value of $1,050,000 for insurance purposes. *Id.* at 80–81; Exh. G–16.

According to Martin Lane, the government's expert, the true value of the Walker 1009 was approximately $500,000. 12/12/03 N.T. at 30–31, 52–53. The government also presented Zomber's deposition testimony from Murphy's civil suit against Ellis in which Zomber admitted that the gun was "overvalued." *Id.* at 109.

Ellis, who lived in Illinois, personally delivered the Walker 1009 to Murphy at his home in Pennsylvania on June 12, 1997. 12/10/03 N.T. at 72–73, 74–75; Exh. G–15.

Tom Wibberley and his son, Bruce Wibberley, were also present at Murphy's house at the time. *Id.* Ellis and Tom Wibberley engaged in a private discussion following which the Wibberleys left. *Id.* Ellis then told Murphy that Tom Wibberley did not want to be Murphy's agent for the acquisition of Colt firearms, and Ellis offered to replace Wibberley in that capacity. *Id.* at 73. Murphy accepted Ellis' offer, and they agreed that Ellis would receive the same commission that Wibberley had received—ten percent on items under one million dollars and five percent on items above one million dollars. *Id.* at 73–74.

### The Walker 1010

On June 12, 1997, after Murphy and Ellis had agreed that Ellis would act as Murphy's agent for the acquisition of Colt firearms, Ellis began discussing with Murphy the possibility of acquiring the Walker 1010, the companion gun to the 1009. *Id.* at 75–76. Ellis then called Zomber from Murphy's house, and let Murphy speak to Zomber over the phone. This was Murphy's first conversation with Zomber, and during the conversation Zomber told Murphy that he would attempt to acquire the Walker 1010. *Id.* at 75–76. Following the phone call with Zomber, Murphy and Ellis discussed how much the Walker 1010 would cost, and Ellis told him that it would cost a lot more than Murphy had paid for the Walker 1009. *Id.* at 76–77.

In July 1997, Ellis and Zomber acquired the Walker 1010 for $450,000 or $500,000.

12/12/03 N.T. at 114, 120; Exh. G–40.[2] In August or September of 1997, Ellis invited Murphy to Moline, Illinois, where Ellis lived, to look at the Walker 1010 and some other Colts. 12/10/03 N.T. at 82–83. Murphy accepted this invitation and traveled to Moline where he viewed the Colts in the vault at Ellis' firm. *Id.* While there, Ellis told Murphy that the Walker 1010 would cost $1,250,000 and that the gun was worth that much. *Id.* at 83–84. Based upon this advice, Murphy bought the Walker 1010 for $1,250,000, which was $750,000 or $800,000[3] more than Ellis and Zomber had paid for it months earlier. *Id.* Subsequently, Ellis appraised the Walker 1010 for Murphy at a value of $1,250,000. *Id.* at 85; Exh. G–18. According to the government's expert, Martin Lane, the true value of the gun was $500,000 or less. 12/12/03 N.T. at 40.

### The Union & Liberty

In December 1998, Zomber purchased a Colt 1860 Army revolver known as the Union & Liberty for either $150,000 or $175,000. 12/11/03 N.T. at 139–40; 12/12/03 N.T. at 119; Exh. G–39.[4] In early January 1999, Ellis contacted Fred Sweeney, another firearms dealer, about writing a letter falsely stating that Sweeney was the owner of the Union & Liberty and offering to sell it for one million dollars. 12/12/03 N.T. at 67–69. Subsequently, Zomber telephoned Sweeney and worked with him to formulate the exact language for the letter. *Id.* at 69. Specifically, Zomber wanted Sweeney to describe the

---

**2.** Zomber testified during his deposition in Murphy's civil suit against Ellis that Ellis purchased the Walker 1010 for $450,000. *See* 12/12/03 N.T. at 114; Exh. G–37. In a separate statement, Zomber stated that Ellis acquired the Walker 1010 in exchange for "antique and modern sporting guns valued at $500,000." *See* 12/12/03 N.T. at 120; Exh. G–40.

**3.** This amount is uncertain because of Zomber's varying declarations about how much Ellis paid to acquire the Walker 1010. *See* note 2, *supra*.

**4.** A July 17, 2001 letter from Zomber attests that he paid $175,000. 12/12/03 N.T. at 119; Exh. G–39. John Gangel, the seller, testified that he sold the gun to Zomber for $150,000. 12/11/03 N.T. at 140.

gun, which Sweeney had never even seen, and to represent that Sweeney was the owner of the gun and offer it for sale. *Id.* at 70–71.

In the end, Sweeney wrote a letter to Ellis dated January 26, 1999 describing the Union & Liberty and stating, "I have available for private offer one of the two finest and most deluxe Colt 1860 Army revolvers known. I've dubbed it the '*Union & Liberty*' Army ...." and "I'm asking one million dollars firm for the '*Liberty & Union*' [sic] Army. I trust you will keep this confidential." *Id.* at 72–75; Exh. G–20. Sweeney testified that he had never seen the Union & Liberty, did not have it available for private offer and that all of the detailed information in the letter was given to him by Zomber. *Id.* at 72–75. Zomber paid Sweeney $25,000 for writing this false letter. *Id.* at 72.

Ellis then passed Sweeney's January 26, 1999 letter on to Murphy along with photographs of the gun. 12/10/03 N.T. at 98; Exh. G–21. Because Murphy did not want to pay one million dollars, Ellis "negotiated" with Sweeney to drive the price down. *Id.* at 104. During these negotiations, Ellis had Sweeney draft an additional letter accepting an offer of $725,000. 12/12/03 N.T. at 77–78; Exh. G–22.[5] On February 1, 1999, after receiving assurance from Ellis that $725,000 was a fair amount, Murphy traded $775,000 worth of antique firearms for the Union & Liberty and a check for $50,000,[6] resulting in a net cost of $725,000 to Murphy. 12/10/03 N.T. at 99, 106, 108–09; Exh. G–26. Murphy believed he was purchasing the gun from Sweeney, when in reality Zomber owned the gun. *Id.* at 109–10; Exh. G–26. Subsequently, Ellis appraised the Union & Liberty at $725,000. *Id.* at 117. According to Martin Lane, the Union & Liberty was worth $300,000, at most. 12/12/03 N.T. at 23, 53.

*The 1862 Police*

After selling Murphy the Union & Liberty, Ellis told Murphy that he was missing two important guns from his collection, one of which was a gun known as the 1862 Police. 12/10/03 N.T. at 111. Initially, Murphy was not convinced that he needed this particular gun because he had already acquired two other 1862 Police revolvers. *Id.* at 113. To convince Murphy, Ellis told him that this particular 1862 Police was especially desirable and that Zomber was interested in it. *Id.* To this end, Ellis showed Murphy a letter dated April 8, 1999 from Zomber to Ellis, stating that Zomber wanted to buy the gun from Ellis for $250,000. *Id.* at 112–14; Exh G–32.

What Murphy did not know at the time was that Zomber and Ellis owned the gun all along. 12/12/03 N.T. at 113. Zomber fabricated the April 8, 1999 letter at Ellis' request. *Id.* Zomber could not purchase the gun because he already owned it. *Id.* Nor was Zomber making the offer on behalf of a potential buyer. *Id.* Nevertheless, on April 21, 1999, Murphy bought the 1862 Police from Ellis for $275,000. 12/10/03 N.T. at 116; Exh. G–34. Subsequently, Ellis appraised the 1862 Police at $275,000. *Id.* at 117; Exh. G–35. According to Martin Lane, the gun was worth $100,000 to $125,000. 12/12/03 N.T. at 40.

On December 15, 2003, after hearing the above evidence, a jury found Zomber guilty of one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Zomber has

---

**5.** There were also additional communications among Ellis, Murphy and Sweeney, all of which were based on the premise that Sweeney was offering the Union & Liberty for sale. Exhs. G–23, G–24, G–25.

**6.** It is unclear from the evidence whether this check came from Sweeney, Ellis or Zomber.

now timely filed a Motion to Vacate His Conviction and for Entry of Judgment of Acquittal or a New Trial.

## II. DISCUSSION

In his unnecessarily long and repetitive 106–page motion, Zomber raises a plethora of arguments for why his conviction should be vacated and either a judgment of acquittal be entered or a new trial be ordered. Zomber generally divides these arguments into seven categories: 1) the evidence was insufficient to support his conviction; 2) the government constructively amended the indictment by adding a different theory of guilt at trial; 3) there was a variance between the evidence at trial and the facts alleged in the indictment; 4) ineffective assistance of counsel; 5) erroneous jury instructions; 6) the Court's erroneous refusal to strike the testimony of Martin Lane; and 7) the government's failure to disclose *Brady/Giglio* material regarding Martin Lane. The Court addresses the substance of each argument below, though not necessarily specifically addressing each of the arguments contained within each category. In doing so, the Court construes the facts of this case as they appear in the trial record, not as Zomber represents them in his memoranda.

### A. Insufficient Evidence to Support Zomber's Conviction

■ Zomber argues that the Court should enter a judgment of acquittal under Federal Rule of Criminal Procedure 29 because the evidence at trial was insufficient to convict him.[7] The jury convicted Zomber of one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. These statutes provide, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... [uses the mails or wires, or causes their use] for the purpose of executing such scheme or artifice... shall be fined under this title or imprisoned .... [8]

In other words, "to prove mail or wire fraud, the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." [9]

■ The evidence must establish that Zomber was involved in a conspiracy with Ellis to violate the aforementioned wire fraud statutes. The federal conspiracy law makes it a crime "[i]f two or more persons conspire either to commit any offense

---

7. In *United States v. Smith*, 294 F.3d 473, 476–77 (3d Cir.2002), the Third Circuit Court of Appeals set forth the appropriate standard of review for a district court on a Motion for Judgment of Acquittal under Federal Rule of Criminal Procedure 29:

> In reviewing a Fed.R.Crim.P. 29 post-verdict motion for judgment of acquittal, a district court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d

257, 262 (3d Cir.2001). The court is required to "draw all reasonable inferences in favor of the jury's verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir.1996). Thus, a finding of insufficiency should "be confined to cases where the prosecution's failure is clear." *United States v. Leon*, 739 F.2d 885, 891 (3d Cir.1984).

8. 18 U.S.C. §§ 1341 & 1343; *see also United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir.2004).

9. *Id.* (quoting *United States v. Antico*, 275 F.3d 245, 261 (3d Cir.2001)).

against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy...." [10] Thus, "[t]o establish a conspiracy, the government must show: (1) a unity of purpose between two or more persons; (2) an intent to achieve a common goal; and (3) an agreement to work together." [11] However, "the essence of a conspiracy is an agreement to commit an unlawful act." [12]

### 1. Intent to Defraud

■ First, Zomber claims that no fraud took place here because the government presented no evidence that he intended to defraud Murphy. To this end, Zomber argues that conspiring to make misleading statements to induce the sale of some of the firearms sold to Murphy, without more, is insufficient to prove Zomber's intent to participate in a scheme to defraud Murphy. This argument lacks merit. Zomber ignores the fact that the government also presented Zomber's own sworn deposition testimony that he knew that Ellis was taking advantage of his agency relationship with Murphy to sell him firearms at "unconscionable markups." [13] Zomber also acknowledged that Murphy was paying more than he should have for these guns and expressed concern to Ellis about what he was going to do when Murphy sold his gun collection. *Id.* at 116. Notwithstanding this knowledge, Zomber assisted Ellis in selling the four guns to Murphy at excessive prices by: 1) drafting a letter falsely stating he had a client willing to pay $1,000,000 for the Walker 1009; 2) telling Murphy over the telephone that he would attempt to acquire the Walker 1010 for Murphy, and then acquiring the gun with Ellis and selling it to Murphy at over a 100 percent markup; 3) paying Sweeney $25,000 to write the false Union & Liberty letter; and 4) fabricating a letter to Ellis stating that he wanted to buy the 1862 Police for $250,000, when in fact he already owned the gun. This evidence is sufficient for a rational trier of fact to find beyond a reasonable doubt that Zomber was guilty of conspiracy to commit mail fraud.

### 2. Puffery

Under this heading, and throughout his memorandum, Zomber argues that his actions constitute mere puffery or sales talk, which is not actionable under the mail and wire fraud statutes.

> Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language. Such sales talk, or puffing, as it is commonly called, is considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer.... The "puffing" rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 109, at 756–57 (5th ed.1984). Puffery is distinguishable from misdescriptions or false representations of specific characteristics of a product. As such, it is not actionable. *See Stiffel Co. v. Westwood Lighting Group*, 658 F.Supp. 1103, 1115 (D.N.J.1987).[14]

---

10. 18 U.S.C. § 371.

11. *United States v. Helbling*, 209 F.3d 226, 238 (3d Cir.2000).

12. *United States v. Jimenez–Recio*, 537 U.S. 270, 274, 123 S.Ct. 819, 154 L.Ed.2d 744 (2003).

13. 12/12/03 N.T. at 106–07.

14. *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir.1993).

In making these arguments, Zomber minimizes the specificity of the false statements contained in his letters and Sweeney's letters to Murphy, comparing them to advertisements for common consumer goods.[15] These comparisons are poorly selected. Zomber did not make general comments to the public at large about his opinion of the quality of the guns in question; if he had, his conduct may not have been actionable. Instead, Zomber concocted (or paid Sweeney to concoct) false letters making specific claims that he had buyers who had made concrete offers for the guns, and letters in which he offered to purchase guns that he already owned. Moreover, these letters were drafted not as advertisements, but with the specific purpose of defrauding Murphy into paying excessive prices for the guns.

The cases on which Zomber relies are inapposite. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir.), is a RICO case involving statements made by a bank to loan applicants relating to financing for the purchase of a business. Indeed, the *Kehr* court works under the assumption that specific promises to provide additional funds were actionable.[16] Further, the Court specifically states that a scheme to defraud "need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.' "[17]

The holding in *United States v. Brown*, 79 F.3d 1550 (11th Cir.1996), is also easily distinguished. The misleading statements in that case involved the value of homes in Florida that the defendants sold to investors. The Court found that because the false statements misled purchasers about the value but not the quality of the homes, the statements were not actionable. However, the Court placed significant weight on the fact that the purchasers could have easily independently investigated the market values of the homes: "The essential pricing information can be obtained by nonexperts readily, for example, by a telephone call or a visit to a ... competitor or by a look at newspaper classified ads." [18]

Here, unlike in *Brown*, Murphy could not make a telephone call, visit a competitor, or look at newspaper classified ads to determine the value of the antique guns he was purchasing; each of these antique firearms was one of a kind. Instead, he paid Ellis a commission to help him acquire guns at a reasonable value. Ellis, aided by Zomber and Sweeney's false letters, took advantage of Murphy by misleading him about the guns' worth and reaping profits in addition to his commission. Moreover, unlike in *Brown*, Murphy was not buying these guns in "arms length" transactions with Ellis and Zomber. Although Murphy may have technically been purchasing the guns from Ellis and Zomber, Ellis had led Murphy to believe that Ellis had acquired the guns on Murphy's behalf and was not making a profit on those sales other than his commission. Based on the above circum-

---

**15.** Specifically, Zomber compares his false statements to "an advertisement that promises the buyer of a sleek convertible greater sex appeal; a shoe salesman falsely telling a customer that the style of shoe under consideration is the 'most popular' style in the store; a real estate broker telling a buyer that there are already several bids on the parcel of property under consideration; a skin cream advertised to make one look 'younger'; or a salesperson in a clothing store telling a customer that a poorly fitting jacket fits 'like a glove' or otherwise flatters the customer's appearance." Zomber Mem. at 14.

**16.** *Kehr*, 926 F.2d at 1415.

**17.** *Id.* (internal citation omitted) (quoting *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987)).

**18.** *Brown*, 79 F.3d at 1559.

stances, a reasonable jury could find that a reasonably prudent purchaser in Murphy's position could not have readily discovered the market value of the guns at issue here.

In sum, Zomber's conduct went beyond the bounds of puffery and was actionable under the mail and wire fraud statute. Stating that someone had offered to pay a specific amount for a specific gun when in fact no such buyer existed is not puffery; it is a textbook *lie*.[19] Further, because of the unique nature of the antique firearms business, a reasonable person in Murphy's position would have had no method of (or reason to) investigate the market value of the guns. Therefore, Zomber's conduct is actionable under the mail and wire fraud statute.

### 3. The lack of misrepresentations regarding the nature and quality of the guns

Throughout his memorandum, Zomber points out that Murphy received the exact guns that he bargained for and paid the exact price he intended to pay. Although this point is correct, it ignores the uncontroverted evidence that Murphy paid the prices he did in reliance on the advice of Ellis, who claimed to be working on his behalf in exchange for a commission, a point glossed over by Zomber. Zomber repeatedly claims that it was unreasonable for Murphy to rely on assessments of the firearms' value provided by the sellers.

However, Murphy was not blindly relying on a *seller's* representations about the value of the product being sold; he was relying on his *agent's* representations, which were supported by the false letters concocted by Zomber and Sweeney. If Ellis had been acting not as Murphy's agent, but as an independent seller, his representations may have been considered puffery. However, those are simply not the facts here. Regardless of the true value of the guns, Ellis and Zomber defrauded Murphy into paying substantially more for the guns than they had acquired them for. That the guns are still very valuable does not excuse this fraud.

### B. Constructive Amendment of the Indictment[20]

 Zomber contends that the Court should vacate his conviction and grant a new trial under Federal Rule of Criminal Procedure 33 because the government constructively amended the indictment by introducing a new theory of fraud at trial: that "Zomber and Ellis acted 'unethically' by breaching a supposed agency agreement Ellis had with Murphy thereby defrauding him."[21] "A constructive amendment occurs where a defendant is deprived of his substantial right to be tried only on charges presented in an indictment returned by a grand jury. A constructive amendment to the indictment constitutes a

**19.** The Court finds Zomber's assertion that the Sweeney letter was "wholly innocuous and literally truthful" to be disingenuous at best. Indeed, in light of the evidence that Sweeney had never even seen the Union & Liberty and that Zomber paid him $25,000 to draft the letter, the Court can easily see how a reasonable jury could view it as an attempt to trick Murphy into thinking Sweeney owned the gun or was representing the owner of the gun and was selling it for $1,000,000. Such a deceptive letter is a far from "innocuous."

**20.** Zomber's remaining arguments (addressed in Part II.B–G., *infra*) are for a new trial

under Federal Rule of Criminal Procedure 33. Rule 33 states: "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Further, "[u]nlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir.2002).

**21.** Zomber Mem. at 29.

per se violation of the fifth amendment's grand jury clause." [22]

■ A review of the Overt Acts section of the indictment reveals allegations that "[i]n or about June 1997, defendant RICHARD ELLIS agreed to become an agent for JM in the acquisition of Colt firearms. As an agent for JM, Ellis agreed to be compensated by JM on a commission basis calculated at an agreed percentage of the acquisition price of the firearm." [23] As such, the grand jury alleged that Ellis becoming Murphy's agent was an element of Ellis and Zomber's conspiracy to defraud Murphy. Therefore, Zomber was on notice that the government would present evidence that Zomber and Ellis used Ellis' agency relationship to defraud Murphy. This agency relationship was relevant to Murphy's reliance on Ellis' assurances that the prices he was paying for the handguns were reasonable and that the letters from Sweeney and Zomber, and the information contained therein, were legitimate and valid. Accordingly, evidence relating to Ellis' agency relationship with Murphy did not amend or alter the charges presented in the indictment.

## C. Variance Between the Evidence at Trial and the Indictment

Zomber next argues that he is entitled to a new trial because there was a variance between the indictment and the evidence presented at trial. At trial, the Court permitted the government to present Zomber's sworn deposition testimony about additional firearms transactions involving Zomber, Ellis and Murphy that were not specifically mentioned in the indictment. Immediately prior to voir dire, Zomber's counsel made what was in effect an oral motion in limine objecting to this testimony as hearsay and irrelevant to the charge in the indictment. After extensive argument from counsel for both sides, the Court admitted this testimony as a party admission and as relevant to Zomber's state of mind about the conspiracy, his knowledge of the fraud, and his willing participation in the conspiracy to defraud Murphy.[24]

■ There was no variance between the indictment and the evidence presented at trial in this case. A variance occurs "where the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." [25] While amendments to the indictment are considered per se violations of the fifth amendment grand jury clause, variances "are subject to less strict case-by-case inquiry, and would only constitute reversible error in those cases where the variance prejudiced the defendant's defense." [26]

■ The indictment alleged that Zomber and Ellis engaged in a conspiracy to defraud Murphy for the purpose of enriching themselves by inducing him "to purchase antique Colt firearms at inflated prices by means of false and fraudulent pretenses." [27] Although the indictment specifically identifies four firearms, the government was entitled to present evidence of Zomber's knowledge of other fire-

---

22. *United States v. Syme*, 276 F.3d 131, 148 (3d Cir.2002) (internal citations and quotations omitted).

23. Indictment at ¶ 10.

24. *See* 12/9/03 N.T. at 6–19 for the arguments and the Court's ruling relating to these additional firearms transactions. The Court's limiting instruction relating to the admission of these other firearms transactions is discussed at Part II.E.1, *infra*.

25. *United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir.1985).

26. *Id.* at 1122.

27. Indictment at ¶ 9–11.

arms transactions involving Ellis, Zomber and Murphy to demonstrate Zomber's awareness of the conspiracy and knowledge that he and Ellis were defrauding Murphy, both of which are elements of mail and wire fraud.[28] Moreover, Zomber was on notice that the government could present this evidence because the evidence and was addressed in the government's trial memorandum and came directly from a sworn statement made by Zomber in the civil case between Murphy and Ellis. Therefore, there was no variance between the indictment and the evidence. Further, even if there was a variance, it did not prejudice Zomber's defense. Accordingly, Zomber is not entitled to relief on this ground.

## D. Ineffective Assistance of Counsel

Zomber, who is represented by new counsel on the instant motion, dedicates more than thirty pages of his memorandum of law and twenty pages of his response memorandum to arguments for a new trial based on ineffective assistance of trial counsel.[29] In its reply memorandum, the government does not address the mer-

---

**28.** The Court specifically instructed the jury that these transactions were introduced for a limited purpose "to help [them] determine defendant's state of mind at the time of the charged conduct." 12/15/03 N.T. at 64.

**29.** In the Table of Contents of his memorandum of law, Zomber lists the following reasons why his conviction must be vacated and a new trial ordered on ineffective assistance of counsel grounds:

B. [Trial Counsel's] Failures To Object To Irrelevant And Unfairly Prejudicial Testimony By Murphy, Gangel, And Lane And To Improper Argument By AUSA Goldman Regarding What Was "Correct," "Proper," Or "Ethical" Conduct In The Antique Firearms Business And To Object To The Court's Jury Instruction That Exacerbated The Prejudicial Impact Of This Testimony Denied Mr. Zomber His Sixth Amendment Right To Counsel. . . .
 3. [Trial Counsel] Stipulated To Martin Lane's Qualifications As An Expert In Antique Firearms. . . .
 4. [Trial Counsel] Failed To Present Evidence Obtained By A Private Investigator Hired By Mr. Zomber That In March 2003, Murphy Claimed At A Texas Gun Show That The Walker 1009 Was Worth $1,250,000 And Walker 1010 Was Worth $1,200,000—Hundreds Of Thousands More Than He Paid For Them.
C. [Trial Counsel's] Failure To Elicit Evidence Of Bias, Motive, And Prior Bad Acts From The Government's Witnesses. . . .
 1. [Trial Counsel] Failed To Cross Examine Martin Lane Regarding Allegations That He Had Stolen A $500,000 Colt Pa-

terson 549 And Sold It To An Associate Of Organized Crime And Other Bad Acts.
 2. [Trial Counsel] Failed To Cross Examine Martin Lane On His Hostility And Bias Towards Ellis, His Motives For Testifying, And The Bases For His Appraisal.
 3. [Trial Counsel] Failed to Cross Examine Lane Or Murphy On The Relationships Between Murphy, Lane, Gavin Lentz, Esq., And R.L. Wilson.
D. Other Trial Errors
 1. [Trial Counsel] Failed To Object To Murphy's Prior Out Of Court Hearsay Statements Recorded In Memoranda That He Prepared Regarding His Dealings With Murphy And Ellis.
 2. [Trial Counsel] Failed To Argue That The Evidence Demonstrated That Mr. Zomber Had No Intent To Induce Murphy To Purchase The Walker 1009 As Part Of A Plot For Ellis To Later Sell Murphy The Walker 1010 At An Inflated Price.
 3. [Trial Counsel] Failed To Cross Examine Fred Sweeney Regarding The Alternative Explanations For The $25,000 Payment From Mr. Zomber That The Government Claimed Was Payment For His Letter Regarding The Union and Liberty Firearm.
 4. [Trial Counsel] Failed To Move For Mistrial Based On Constructive Amendment/Variance Of Indictment Based On Government's Shift Of Prosecution Theory.
 5. [Trial Counsel] Did Not File Any Pre-Trial Motions.
 6. [Trial Counsel] Did Not Seek To Enforce The Defense's Trial Subpoena.
Pl.'s Mem. at 2–4.

its of these arguments, asserting only that Zomber's ineffective assistance of counsel claims should be dismissed as premature in light of the Third Circuit's strong preference for reviewing ineffective assistance of counsel claims in collateral proceedings under 28 U.S.C. § 2255 instead of on direct appeal.[30] In his response, Zomber argues that the cases relied on by the government involve ineffective assistance of counsel claims raised on direct appeal and not on post-verdict motions as is the situation here. Thus, according to Zomber, the Court should hold any necessary evidentiary hearings and resolve these issues under the instant motion.

 Notwithstanding Zomber's arguments, the case law appears quite clear that ineffective assistance of counsel claims should be raised through a § 2255 petition rather than on direct appeal. "The rationale underlying this preferred policy is that oft-times such claims involve allegations and evidence that are either absent from or not readily apparent on the record."[31] This rationale applies here, as this Court may require an evidentiary hearing to further develop the record before ruling on some of Zomber's ineffective assistance claims. Therefore, Zomber's ineffective assistance of counsel claims are more appropriate for a § 2255 petition.[32] Accordingly, the Court denies Zomber's motion on this ground without prejudice to his right to raise his ineffective assistance of trial counsel claims on collateral attack.[33]

**30.** *See United States v. Sandini*, 888 F.2d 300, 312 (3d Cir.1989) ("We have repeatedly expressed our strong preference for reviewing allegations of ineffective assistance of counsel in collateral proceedings under 28 U.S.C. § 2255 rather than on direct appeal."); *see also United States v. Gaydos*, 108 F.3d 505, 512 n. 5 (3d Cir.1997) ("We have emphasized our preference that claims of ineffectiveness of counsel be raised in a collateral proceeding under 28 U.S.C. § 2255. Thus, although Gaydos claims of ineffective counsel may be meritorious, they must be raised through a § 2255 petition.")

**31.** *United States v. Gambino*, 788 F.2d 938, 950 (3d Cir.1986).

**32.** *See United States v. Patrick*, 985 F.Supp. 543, 551–52 (E.D.Pa.1997) ("It is this type of case—one where evidentiary hearings would have to be held—wherein the defendant must file a § 2255 motion if he wishes to raise an ineffective assistance of counsel claim.")

**33.** The cases cited by Zomber are inapposite. In *United States v. Cocivera*, 104 F.3d 566 (3d Cir.1996), the defendant asked to represent himself on the second day of trial because he was unhappy with his counsel's performance. The court conducted a hearing on the issue and eventually allowed the defendant to represent himself. Because the trial court had conducted a hearing on the effectiveness of counsel, the Third Circuit made an exception to its general preference that ineffective assis-tance of counsel claims not be heard on direct appeal. In doing so, however, the Third Circuit reiterated its strong preference that ineffective assistance claims be addressed in § 2255 proceedings:

> This court has long followed the practice of declining to consider a defendant's claim of ineffective assistance of counsel on direct appeal. As we have explained in our case law, the issue is ordinarily more appropriate for collateral attack. This affords the opportunity to develop a factual basis for the claim that counsel's performance did not meet the standard for effective assistance of counsel. It also gives the trial court the opportunity to hear counsel's explanation for the conduct at issue. Frequently, the direct appeal is handled by the same counsel who handled the trial, and it is patent that counsel cannot forcefully argue ineffective assistance of trial counsel. On the other hand, we have recognized that in some cases, albeit rare, we may have a sufficient record on appeal to decide the issue and avoid the considerable effort of requiring the defendant to institute a collateral proceeding in order to raise the ineffective assistance of counsel claim.

*Cocivera*, 104 F.3d at 570–71 (internal citations omitted)

In the second case relied on by Zomber, although the court does appear to have conducted an evidentiary hearing on an ineffective assistance of counsel claim raised on

## E. Erroneous Jury Instructions

Zomber next argues that he is entitled to a new trial because the Court's jury instructions were erroneous, misleading, and unfairly prejudicial. Upon review of the jury instructions, the Court finds that " 'viewed in light of the evidence, the charge as a whole fairly and adequately submit[ed] the issues in the case to the jury.' " [34] Nevertheless, the Court addresses each of Zomber's jury instruction arguments below.

### 1. Standard of Review

██ Because Zomber did not object to any jury instructions at trial,[35] the Court reviews its instructions for plain error.[36] "For plain error to exist: There must be an 'error' that is 'plain' and that 'affects substantial rights.' . . . A deviation from a legal rule is 'error.' A 'plain' error is one which is 'clear' or 'obvious.' In most cases, an error will 'affect substantial rights' where it is prejudicial: 'It must have affected the outcome of the District Court proceedings.' " [37] The burden is on Zomber to show prejudice.[38] As a result, " 'it is a rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " [39]

### 2. The Court's Instruction on the "Fraudulent Nature of the Scheme"

Zomber contends that one sentence out of the Court's lengthy instruction defining a "scheme to defraud" was unfairly prejudicial and allowed the jury to convict him based on an overly broad theory of mail fraud. Zomber quotes only a small portion of the instruction relating to a scheme to defraud in his memorandum, but because the jury instructions must be viewed as a whole,[40] the Court sets forth the entire instruction below with emphasis on the section contested by Zomber.

Mail fraud consists of three essential elements. First, a defendant must knowingly devise or participate in a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises. And number two, a defendant must act with the specific intent to defraud. And three, in advancing, furthering or carrying out a scheme the defendant used the mails or any private or commercial interstate carrier or caused the mails or and private or commercial interstate carrier to be used.

. . .

post-verdict motions, there is no indication in the opinion that the Third Circuit's preference was ever considered by the court. *See United States v. Hawkins,* No. Crim.A. 93–221–01, 1995 WL 297041 (E.D.Pa. May 11, 1995).

**34.** *United States v. Zehrbach,* 47 F.3d 1252, 1264 (3d Cir.1995) (quoting *Bennis v. Gable,* 823 F.2d 723, 727 (3d Cir.1987)).

**35.** 12/15/03 N.T. at 3, 77.

**36.** Fed.R.Crim.P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *United States v. Gambone,* 314 F.3d 163, 182 (3d Cir.2003) ("Inasmuch as they did not object to the instructions at trial, we examine the charge for plain error.").

**37.** *United States v. Retos,* 25 F.3d 1220, 1228–29 (3d Cir.1994) (quoting *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

**38.** *Olano,* 507 U.S. at 734, 113 S.Ct. 1770 ("It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.").

**39.** *Gambone,* 314 F.3d at 182 (quoting *United States v. Gordon,* 290 F.3d 539, 545 (3d Cir. 2002)).

**40.** *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987) ("It is well settled that a single jury instruction may not be evaluated in artificial isolation; rather, it must be evaluated in the context of the overall charge.")

And let's break down a few of the phrases that are in there. Let's talk about the first element, any scheme to defraud and false or fraudulent pretenses, representations or promises. The phrase any scheme for obtaining money or property means any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value. The term false or fraudulent pretenses, representations or promises means a statement or an assertion which concerns a material or important fact or a material or important aspect of the matter in question and that was either known to be untrue at the time that it was made or used, or that was made or used with reckless indifference as to whether it was, in fact, true or false and made or used with the intent to defraud.

. . .

The term false or fraudulent pretenses, representations or promises includes direct false statements as well as half truths and includes the knowing concealment of facts that are material or important to the matter in question and that were made or used with the intent to defraud. It is not necessary for the government to prove that the defendant was actually successful in obtaining money or property by means of false or fraudulent pretenses, representations or promises. It is not necessary for the government to prove that anyone lost any money or property as a result of the scheme or plan to obtain money or property by means of false or fraudulent pretenses, representations or promises. An unsuccessful scheme is as illegal as a scheme or plan that is ultimately successful.

The fraudulent nature of a scheme is not defined according to any technical standards. *Rather, the measure of a fraud in a mail fraud case is whether that scheme shows a departure from fundamental honesty, more uprightedness or fair play and candid dealings in the general life of a community.* Fraud embraces all of the means which human ingenuity can devise to gain advantage over another by false representations, suggestion, or suppression of the truth or deliberate disregard or omission of the truth.

It is not necessary that the government prove every detail alleged in the indictment concerning the precise nature, purpose or means of the scheme. What must be proved beyond a reasonable doubt is that the defendant knowingly conspired to participate in a scheme to defraud substantially the same as the one alleged in the indictment. Particular aspects of a scheme considered separately need not be illegal in order for you—for a scheme to defraud to exist. Rather, it is sufficient f you find beyond a reasonable doubt that the scheme, as a whole, which was the object of the conspiracy, involved fraudulent conduct.[41]

 Read as a whole, this instruction did not, as Zomber contends, permit the jury to convict him if it found that his conduct departed from "fundamental honesty, moral uprightedness or fair play and candid dealing in the general life of the community." Rather, the Court's instruction required the jury to convict Zomber only if it found that the government had proved all of the elements of mail fraud beyond a reasonable doubt. Indeed, the

---

**41.** 12/15/03 N.T. at 58–61; *see also United States v. Schwartz*, 899 F.2d 243, 246–47 (3d Cir.1990) ("Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community.")

very next sentence of the instruction specifies that fraud includes those ways that one person can gain an advantage over another by use of "false representations, suggestion, or suppression of the truth or deliberate disregard or omission of the truth." Moreover, when initially setting out the elements, the Court specified that the purpose of the scheme to defraud must have been "to obtain money or property by *materially false or fraudulent pretenses, representations or promises."* [42]

The language Zomber contests has been repeatedly utilized in opinions within this circuit to define a scheme to defraud.[43] Notwithstanding this fact, Zomber argues that this language was inappropriate for use in a jury instruction. Zomber does not, however, demonstrate how this instruction constituted plain error. Regardless of whether the Third Circuit intended for this language to be used in jury instructions, it is clearly the law of this circuit.[44] As such, the Court finds it difficult to fathom how the use of this one sentence of the Third Circuit's own language in the context of a lengthy instruction could constitute plain error. Accordingly, Zomber is not entitled to relief on this ground.

### 3. The Court's Instruction on "Intent to Defraud"

■ In a rather egregious example of Zomber's attempt to have the Court review individual instructions in isolation from the whole, Zomber makes two separate objections with respect to the Court's instruction on intent to defraud. First, Zomber takes issue with the second sentence from the following instruction:

> And what is intent, intent to defraud? *Well to act with an intent to defraud means to act knowingly and with the intention or specific purpose to deceive or to cheat.* An intent to defraud is accompanied, ordinarily, by a desire or with a purpose to bring about some gain or benefit to oneself or with a purpose to bring about some gain or benefit to oneself or to some other person or by a desire or with a purpose to cause a loss to some person.[45]

According to Zomber, the emphasized portion of the above instruction does not distinguish between "intent to deceive" and "intent to deceive for the purpose of causing some harm." This argument is without merit and fails to consider the instructions as a whole. The Court fails to see how this instruction was plainly erroneous.

---

42. 12/15/03 N.T. at 58.

43. *See, e.g. United States v. Thomas,* 315 F.3d 190, 196 (3d Cir.2002) ("We have held that a 'scheme to defraud' is measured 'by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community.'") (quoting *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987); *see also United States v. Frost,* 125 F.3d 346, 371–72 (6th Cir.1997) (approving use of this language in a jury instruction).

44. Zomber citation to *United States v. Murphy,* 323 F.3d 102, 116 (3d Cir.2003), as evidence of the Third Circuit's criticism of the language at issue is incorrect. The quotation of *Murphy* used by Zomber deals with "honest services" fraud as evidenced by the sentence

following the quote that Zomber failed to include in his memorandum: "We thus endorse (and are supported by) the decisions of other Courts of Appeals that have interpreted § 1346 more stringently and required a state law limiting principle for *honest services* fraud, as set forth in the margin." *Murphy,* 323 F.3d at 116 (emphasis added).

45. 12/15/03 N.T. at 61 (emphasis added); *see also* 2A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions* § 47.14 (5th ed.2000) ("To act with an 'intent to defraud' means to act knowingly and with the intention or the purpose to deceive or to cheat. An intent to defraud is accompanied, ordinarily, by a desire or a purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person.").

Nine pages later in his memorandum of law, Zomber attempts to raise a separate and distinct objection to the third sentence in above-quoted instruction. This time, Zomber claims that the Court's instruction that fraud is ordinarily accompanied by "a desire or with a purpose to bring about some gain or benefit to oneself or to some other person" does not satisfy the requirement that the government prove that the defendant intended to harm the victim. Zomber's blatant attempt to impede the Court from reviewing this instruction as a whole is transparent. The Court adequately covers Zomber's concern in the previous sentence when it instructed that "intent to defraud means to act knowingly and with the intention or specific purpose to deceive or cheat." Accordingly, this instruction was not plainly erroneous, and Zomber is not entitled to relief on this ground.

### 4. The Court's Instruction that "it is not a defense to say that a scheme should not have deceived the victim"

■ With this argument, Zomber takes issue with the Court's use of the word "deceived" rather than "defrauded." This argument is also without merit. Whether there is a true distinction between deceive and defraud is irrelevant to the purpose of this instruction which is to state that a defendant cannot use a victim's negligence as a defense.[46] Zomber fails to demonstrate how use of the word "deceive" instead of "defraud" confused the jury to such an extent as to constitute plain error. Therefore, relief is denied on this ground.

### 5. The Court's Failure to Instruct the Jury That a Scheme to Defraud "Must Involve Some Type of Fraudulent Misrepresentations or Omissions That Are Reasonably Calculated to Deceive Persons of Ordinary Prudence and Comprehension Under the Circumstances in Which the Misrepresentations or Omissions Were Made."

Because Zomber preserved his objection to the Court's refusal to give this instruction, the Court reviews this ruling for abuse of discretion.[47] "A court errs in refusing a requested instruction only if the omitted instruction is correct, is not substantially covered by other instructions, and is so important that its omission prejudiced the defendant."[48] Even under this lower standard, Zomber still does not demonstrate why he is entitled to this instruction.

■ In support of his claim, Zomber argues primarily that Murphy's reliance on Zomber's and Sweeney's letters was unreasonable and cites to the same cases and resorts to the same arguments he makes in relation to puffing. As discussed in Part II.A.2, *supra*, the evidence showed that the statements made in Zomber and Sweeney's letters amounted to more than mere puffery. Further, Zomber's extensive discussion about why Murphy's reliance was unreasonable is misplaced because Murphy's negligence in failing to discover the fraudulent scheme is irrelevant.[49]

---

46. *See United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir.1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct.")

47. *Zehrbach*, 47 F.3d at 1264.

48. *Gov't of Virgin Islands v. Fonseca*, 274 F.3d 760, 769 (3d Cir.2001) (quoting *United States v. Davis*, 183 F.3d 231, 250 (3d Cir. 1999)).

49. *United States v. Rennert*, 374 F.3d 206, 213 (3d Cir.2004) ("[T]he fraud victim's negligence or lack of diligence in uncovering the

■ Once again, a review of the instructions as a whole reveals that substance of Zomber's proposed instruction was covered by the following instruction on materiality:

> The term false or fraudulent pretenses, representations or promises means a statement or an assertion which concerns a material or important fact or a material or important aspect of the matter in question and that was either known to be untrue at the time that it was made or used, or that was made or used with reckless indifference as to whether it was, in fact, true or false and made or used with the same intent to defraud.
>
> *A material fact is a fact that would be of importance to a reasonable person in making a decision about a particular matter or transactions.* In some cases a defendant may know or have reason to know that the alleged victim regards, or is likely to regard, the matter as important even if a reasonable man would not regard the same matter as important. In such a case the matter is material. Moreover a matter may be material even if the victim knew the statement was false or did not actually rely on the matter in making a decision.

This instruction conveyed to the jury that the fraudulent misrepresentations must have been misleading to a reasonable person under the circumstances. As such, it covered the substance of Zomber's proposed instruction. Therefore, Zomber is not entitled to relief on this ground.

fraud is not a defense."); *Coyle*, 63 F.3d at 1244.

**50.** Zomber did not object to this instruction during the trial, so the Court reviews this issue under the plain error standard. *Gambone*, 314 F.3d at 182.

**51.** 12/15/03 N.T. at 64.

### 6. The Court's Limiting Instruction Regarding Evidence of Other Acts

Zomber contends that the Court's instruction about the limited purpose for the admission of evidence of other firearms transactions was insufficient.[50] The Court instructed the jury as follows:

> Now there was some evidence introduced by the government of other transactions between the defendant and the alleged co-conspirator here, Mr. Ellis. These acts not named in the indictment and not considered to be overt acts in furtherance of the conspiracy, were introduced for what we call a limited purpose, a limited purpose only. It was to help you determine defendant's state of mind at the time of the charged conduct.[51]

■ According to Zomber, this instruction was ambiguous and confusing because it did not mention what "other transactions" the Court was referring to and did not specify what "state of mind" these other acts could be used to prove. Once again, Zomber fails to consider the instructions as a whole. The "state of mind" evidence to which the Court was referring related to the requirement that Zomber had knowingly defrauded Murphy, as the Court instructed the jury earlier in its instructions.[52] Further, the Court intentionally did not to refer to the specific evidence of this case in its instructions so as not to increase the significance of any particular evidence to the jury. As with the other instructions Zomber contests,

**52.** *Id.* at 61 ("A term you have heard and will continue to hear is knowingly. What is knowingly? Knowingly means that the act was done voluntarily and intentionally and not because of mistake or accident. And this definition will apply whenever that term is used in this case.").

Zomber fails to show how this instruction was plain error, resulting in a miscarriage of justice. Relief is denied on this ground.

### 7. The Court's Refusal to Give a Puffing Instruction

Zomber contends that the Court erred in refusing to give the following proposed instruction:

> In deciding whether defendant Michael Zomber made any fraudulent misrepresentations or omissions, you should keep in mind that mere "puffing" or sales talk is not a crime under the federal fraud statutes.[53]

As the Court discussed in detail, *supra* Part II.A.2., Zomber's conduct far exceeded the bounds of puffery. Therefore, Zomber was not entitled to a puffery instruction and the Court did not abuse its discretion here.

### F. The Court's Refusal to Strike the Direct Examination Testimony of Martin Lane

On direct examination, the government questioned its expert, Martin Lane, about the monetary value of the four firearms listed in the indictment. Lane's valuations were presented for 2001, and not 1997–99, when Murphy purchased the firearms. Defense counsel moved to strike Lane's direct testimony as irrelevant. The Court took defense counsel's motion under advisement, stating that Lane's testimony was not complete because the government could ask about the value of the firearms at the time of purchase on redirect. Defense counsel then continued his cross-

examination and proceeded to ask Lane about the values of the firearms at the time Murphy purchased them from Ellis and Zomber. Zomber now argues that the Court abused its discretion in refusing to grant the motion to strike Lane's direct testimony.

 Zomber argues that the government should not have been allowed to ask Lane about the value of the firearms at the time of purchase on redirect because such questioning would have gone beyond the scope of cross-examination. This is a matter that is clearly within the discretion of the Court.[54] On cross-examination, defense counsel asked Lane, "Are you telling us, sir, that the Walker 1009 was only worth $500,000 in January of 1997?" and Lane responded, "I wasn't giving a value of 1997."[55] Because defense counsel "opened the door" as to a possible difference between the value of the firearms in 2001 and their value when purchased by Murphy, the Court did not abuse its discretion by indicating that it would allow the government to question Lane in this area on redirect. Nevertheless, such questioning was rendered largely unnecessary because while defense counsel's motion to strike was under advisement, he proceeded to elicit this same information on Lane's cross-examination. Accordingly, the Court did not abuse its discretion in refusing to grant Zomber's motion to strike Martin Lane's direct testimony.

### G. Brady/Giglio Material

 Zomber contends that the government withheld information relating to a

---

**53.** Zomber's Mem. of Law at 102, Exh. 1. Zomber preserved his objection to the Court's refusal to give this instruction, so the Court reviews this ruling for abuse of discretion. *See Zehrbach,* 47 F.3d at 1264

**54.** *United States v. Walker,* 421 F.2d 1298, 1300 (3d Cir.1970) ("The conduct of the examination of a witness on his redirect exami-

nation and whether or not a question is proper, whether or not new matter should be admitted, or whether there should be an explanation or avoidance of new matter brought out in the cross-examination, are questions that are largely within the discretion of the court.")

**55.** 12/12/03 N.T. at 25.

civil suit against Martin Lane in violation of the rule set forth in *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, non-disclosure of evidence affecting credibility" justifies a new trial irrespective of the good faith or bad faith of the prosecution. The evidence must be material and "[a] new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . ."[56]

██ Here, Zomber fails to demonstrate how information about a pending civil suit[57] against Lane that bears no relation to the instant criminal case would be admissible as impeachment material.[58] Moreover, Lane's testimony, which consisted primarily of his opinion of the antique firearms' value, was not necessary to the government's case against Zomber.[59] Therefore, Lane's testimony was not determinative of Zomber's guilt or innocence, and any failure by the government to turn over impeachment material on Lane was not a *Giglio* violation.

In addition, the government states in its memorandum of law that it first learned of this lawsuit against Lane in Zomber's post-trial motion, and further, that there was no reason for the government to have been aware of that suit as the government was not a party.[60] If the government was unaware of this pending civil suit, it could not have withheld information relating to the suit. Accordingly, there was no *Brady/Giglio* violation here, and Zomber is not entitled to relief on this ground.

## III. CONCLUSION

For the foregoing reasons, Defendant Michael Zomber is not entitled to a judgment of acquittal or to a new trial, and the instant motion is denied.

An appropriate Order follows.

### ORDER

**AND NOW,** this 28th day of February, 2005, upon consideration of Defendant Michael Zomber's Motion to Vacate His Conviction and for Entry of Judgment of Acquittal or a New Trial [Doc. # 52], the Government's Reply [Doc. # 56], and Defendant's Response [Doc. # 61], it is hereby **ORDERED** that Defendant's Motion is **DENIED.**

---

**56.** *Giglio,* 405 U.S. at 154, 92 S.Ct. 763 (internal quotations omitted).

**57.** *Antiques & Arts Trading Consultants, Inc. v. Lane,* No. 03–4360 (S.D.N.Y.).

**58.** *See* Fed.R.Evid. 608; *cf.* 3A John Henry Wigmore, *Evidence* § 980a (Chadbourn rev. 1970) ("[A] mere *arrest* or *indictment* will not be allowed to be inquired after; since the fact of arrest or indictment is quite consistent with innocence, and since the reception of such evidence is merely the reception of somebody's hearsay assertion as to the witness' guilt. To admit this would involve a violation of both the hearsay rule and of the rule forbidding extrinsic testimony of misconduct. . . . It should be understood by all courts that the only relevant circumstance is actual conduct, i.e., the fact, not the mere charge, of having misbehaved. If it is improper to prove this by extrinsic testimony on the stand, it is doubly improper to attempt to prove it by hearsay, and trebly improper when accompanied by a prohibition of any rebuttal of the hearsay by the witness or by others on his behalf.")

**59.** *See generally United States v. Copple,* 24 F.3d 535, 544 (3d Cir.1994) ("[T]he government does not have to show that the victims actually suffered a loss to satisfy the elements of the mail fraud statute. . . . Proof of actual loss by the intended victim is not necessary.")

**60.** Conversely, elsewhere in his memorandum of law, Zomber states that his trial counsel had available to him information about this civil suit and had even spoken with the plaintiff's counsel in that case. Zomber Mem. at 64–65.

It is further **ORDERED** that sentencing will be scheduled within thirty (30) days of the date of this Order.

It is so **ORDERED**.